UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X
JONG BU WANG,

                       Plaintiff,

        -against-

KEEPER HOLDINGS, INC., *et al.*,

                       Defendants.
--------------------------------------------------------X

**MEMORANDUM AND ORDER**
24 CV 672 (CLP)

**POLLAK**, United States Magistrate Judge:

On January 30, 2024, plaintiff Jong Bu Wang ("plaintiff" or "Wang") commenced this action against defendants Keeper Holdings, Inc. ("Keeper Holdings"), Steven Yang ("Yang"), and Katy Lee ("Lee") (collectively, "defendants"), alleging that defendants had failed to pay her minimum and overtime wages, in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, and the New York Labor Law ("NYLL") § 650 *et seq.*; failed to pay spread-of-hours pay in violation of the NYLL; and failed to provide accurate wage notices and wage statements in violation of NYLL §§ 195(1), (3).[1]

Following a jury trial held before this Court on December 15, 2025, through December 18, 2025, plaintiff filed a motion for a new trial pursuant to Federal Rule of Civil Procedure 59(a)(1)(A). (Pl.'s Mot.;[2] Pl.'s Supp. Mot.[3]).

As set forth below, plaintiff's motion for a new trial is denied. Plaintiff is awarded $5,168.75 in damages pursuant to the jury's verdict.

---

[1] The Complaint also raised claims of unlawful deduction from employees' [sic] wage, failure to pay for all hours worked in violation of NYLL § 191, and failure to provide a day of rest, paid sick leave, and family leave. (Compl. ¶ 1 (ECF No. 1)). Plaintiff did not pursue these additional claims at trial.

[2] Citations to "Pl.'s Mot." refer to Plaintiff's Memorandum of Law in Support of Plaintiff's Motion for New Trial Pursuant to Federal Rules of Civil Procedure 59(a)(1)(A), filed on December 23, 2025. (ECF No. 51).

[3] Citations to "Pl.'s Supp. Mot." refer to Plaintiff's Motion for a New Trial Pursuant to Fed. R. Civ. P. 59(a), filed on December 29, 2025. (ECF No. 56).

## BACKGROUND

I.    The Complaint

Plaintiff alleged in her Complaint that she was hired by defendants Steven Yang and Katy Lee in 2015 and worked for defendants as a live-in domestic helper until January 15, 2024. (Compl. ¶¶ 3, 7, 8).  Her responsibilities included childcare, providing transportation to school or daycare, house cleaning, meal preparation, laundry for the family, and dishwashing.  (Id. ¶ 10). Plaintiff alleged that defendants Yang and Lee assigned work to plaintiff, had the power to hire and fire and discipline plaintiff, set the terms and conditions of her employment and the amount and manner of her pay.  (Id. ¶¶ 29-36).

Plaintiff also alleged that she was employed by Keeper Holdings, doing business as "Heartloom," a retail apparel and accessory company owned by defendant Lee, where plaintiff assisted defendant Lee with the work of the company.  (Id. ¶¶ 10, 23, 27, 37, 40, 41).  She claimed that she was obligated to run errands, tag and iron clothes, pack and handle FedEx/UPS shipping, acquire props, and provide transportation and assist with filming in Manhattan for the company.  (Id. ¶ 23).

In the Complaint, plaintiff alleged that she worked more than fourteen (14) hours a day on weekdays, twelve (12) hours a day on Saturdays, and four (4) hours a day on Sundays, until January 2023, after which she did not work on Sundays.  (Id. ¶¶ 11, 12).  She alleged that she was paid a weekly pay of $600 per week until September 2017, when her pay increased to $750 a week, which remained her weekly pay until the end of her employment. (Id. ¶ 14).  Plaintiff alleged that defendants failed to maintain any records of her hours worked and failed to obtain legal advice or counsel regarding their pay practices.  (Id. ¶¶ 16, 43, 44, 46).

2

II.    Procedural Background

Defendants filed an Answer on April 11, 2024 (ECF No. 14), and, following an initial conference with this Court, the parties were referred to early mediation. (Order, dated May 28, 2024). On January 7, 2025, the parties reported that the mediation had been unsuccessful (ECF No. 17), and a discovery schedule was set. (Order dated February 24, 2025). On September 5, 2025, this Court held a settlement conference with the parties, and when the discussions failed to result in a settlement, the Court set a trial schedule with jury selection to begin on December 15, 2025. (Order, dated October 24, 2025). A final pretrial conference was held on December 12, 2025.

The parties submitted their pretrial order, along with various motions in limine, seeking to preclude the admission of certain documents, which motions were granted in part and denied in part by Order of the Court, dated December 12, 2025. (ECF No. 45). Among the issues raised was the admissibility of plaintiff's handwritten journal containing day-by-day summaries of the tasks plaintiff performed during that day and the times when she began working on some of the tasks. (See id. at 4). Plaintiff sought to prevent defendants from challenging the accuracy of the journals based on plaintiff's own deposition testimony indicating that she began keeping the journal entries at a point in time when she realized she was not being paid properly. (Id.) Defendants also objected at trial to the general admissibility of the journal on grounds of hearsay, arguing that it should only be used to refresh recollection. (Tr.1[4] at 110).

A jury trial was held before the undersigned on December 15, 2025 through December 18, 2025. At trial, given the defendants' failure to comply with their statutory obligation to maintain records of hours worked and pay received, the Court ultimately admitted into evidence

---

[4] Citations to "Tr.1" refer to the transcript of proceedings during the first day of trial, Monday, December 15, 2025. The transcripts are continuously and consecutively paginated.

over defendants' objection the journal entries, both the Korean original and the English translation, pursuant to Federal Rule of Evidence 807. (Tr.2[5] at 315). During the trial, defendants challenged the relevance of the journal entries, arguing to the jury that while the entries reflected a start time for certain tasks, they generally did not reflect a time when the task work was completed. (E.g., id. at 570). Nevertheless, the jury was permitted to consider the journal entries, and was instructed that it was the defendants' obligation to maintain accurate records; plaintiff, as the employee, was under no obligation to keep any records whatsoever. (Tr.3[6] at 602-03, 609).

Prior to trial, the Court directed the parties to submit proposed jury instructions and verdict sheet by December 8, 2025. (Trial Management Order, dated October 24, 2025). Upon defendants' request, the deadline was extended to December 10, 2025, three business days before the trial was set to begin. (Electronic Order, dated December 8, 2025). At the final pretrial conference held on December 12, 2025, plaintiff agreed to withdraw her FLSA overtime claim because the law is clear that, as a live-in domestic worker, she is exempt from the overtime protections of the FLSA. 29 U.S.C.A. § 213(b)(21) (stating the live-in domestic service exemption). During discussions at the final pretrial conference, relating to the proposed jury charge and verdict sheet, it became clear that plaintiff would likely be entitled to a greater recovery for minimum wage violations under the NYLL than under the FLSA largely because the New York minimum wage rate was always higher than the federal minimum wage rate for the entire relevant period. Thus, it was agreed that, in order to avoid jury confusion, plaintiff

---

[5] Citations to "Tr.2" refer to the transcript of proceedings during the second day of trial, Tuesday, December 16, 2025.
[6] Citations to "Tr.3" refer to the transcript of proceedings during the third day of trial, Wednesday, December 17, 2025.

would proceed only on three NYLL claims: minimum wage, overtime, and spread-of-hours.[7] Depending on the outcome at trial, plaintiff stated she would consider dismissing the remaining FLSA claim.

It was further agreed that instead of asking the jury to calculate the damages owed for each week for the entire six-year period encompassing plaintiff's claims, which spanned several changes to the NYLL minimum wage rate,[8] the jury would simply be asked to determine how many hours plaintiff worked each week during that six-year period, and how many days per week they found she had worked a spread of 10 or more hours and had not been paid spread-of-hours pay. The parties would then supply the Court with their calculation of monetary damages for each week, using the NYLL wage rates that were in effect during each relevant time period, and the Court would determine damages. The parties reviewed and proposed edits to the charge and the verdict sheet, which the Court considered and incorporated.

To assist the jury in making its determinations, the parties were asked to prepare a week-by-week chart for the jury to use as a guide to report their verdict as to how many hours each week they found the plaintiff had performed work for defendants, and how many days per week they found she had worked a spread of 10 or more hours and had not been paid spread-of-hours pay. Although both parties submitted their own proposed chart, the Court ultimately adopted plaintiff's proposed chart, which was given to the jury at the time of deliberations as a

---

[7] At the final pretrial conference, the Court orally dismissed plaintiff's claims for failure to provide accurate wage notices and wage statements under the Wage Theft Prevention Act, N.Y. Lab. Law §§ 195(1), (3), for lack of jurisdictional standing because plaintiff had failed to allege an injury-in-fact flowing from the statutory violation. See Guthrie v. Rainbow Fencing Inc., 113 F.4th 300, 308 (2d Cir. 2024) (holding that in order to bring a claim under NYLL § 195, "a plaintiff must show some causal connection between the lack of accurate notices and the downstream harm"); Jaramillo v. Latino Regal Corp., No. 19 CV 3104, 2024 WL 4648135 (E.D.N.Y. Sept. 4, 2024).

[8] Given that the minimum wage in New York during the period of employment changed multiple times, the jury would have had to determine the number of hours worked by plaintiff each week, and then multiplied the number of hours by the applicable rates in effect at the time in order to determine if plaintiff had been paid the proper amount for each wage period.

"supplemental verdict sheet." Ultimately, the parties were given an opportunity to object to the proposed charge, verdict sheet, and supplemental verdict sheet before they were given to the jury on December 17, 2025.

After the jury rendered its verdict, the Court directed the parties to provide post-trial briefing by December 22, 2025 "regarding the issue of whether, for purposes of calculating minimum wage and overtime damages, the regular rate [under the NYLL is to be] calculated by dividing the weekly salary by the total hours worked each week, such that the regular rate fluctuates depending on the week, or by dividing the weekly salary by a fixed number of hours, e.g., 44, the presumed number of hours in a workweek for a residential employee for purposes of calculating overtime hours." (Electronic Order, dated December 19, 2025). Given plaintiff's stated intention to challenge the jury's verdict, the parties were asked to file any post-trial motions by December 23, 2025. (Id.) Defendants timely filed their post-trial brief regarding calculating the regular rate on December 22, 2025. (ECF No. 49). Plaintiff filed her post-trial brief regarding the regular rate, one day later, on December 23, 2025. (ECF No. 50). That same day, plaintiff timely filed her motion for a new trial (Pl.'s Mot.), which defendants opposed on December 26, 2025 (ECF No. 53). Defendants subsequently filed a letter regarding spread-of-hours compensation on December 24, 2025. (ECF No. 52). Plaintiff filed a motion for attorney's fees on December 28, 2025 (ECF No. 54), accompanied a day later by a bill of costs. (ECF No. 55).

The Court held a settlement conference on December 29, 2025. (Minute Entry, dated December 29, 2025). Although the parties reached a settlement in principle during the conference, the agreement fell apart thereafter, and plaintiff filed a supplemental motion for a

new trial, raising an additional ground for seeking a new trial. (Pl.'s Supp. Mot.). Defendants filed an opposition to the supplemental motion on December 30, 2025. (ECF No. 57).

III.    Trial Testimony

    A.    Plaintiff's Testimony[9]

During the course of the trial, the plaintiff testified extensively about the interview process by which she was hired, the fact that she was hired primarily to perform childcare for the defendants' two young daughters, and that she was responsible for taking them to and from school or daycare, and caring for them after school until defendant Yang returned from work, usually around 7:00 to 7:30 p.m. (Tr.1 at 126, 129; Tr.2 at 204, 244-45 (agreeing that her priority was childcare and, on cross-examination, recalling testimony during her deposition that the job was described as covering the time when the children woke up in the morning until dinner)). She was also expected to perform light household tasks, including meal preparation for the entire family, dishwashing, laundry for the entire family, grocery shopping, vacuuming the house, and cleaning the two bathrooms. (Tr.1 at 126, 129; Tr.2 at 204, 279-86). She testified that when she was hired, no one told her how many hours she was expected to work, nor was she told that her weekly pay was limited to a certain number of hours. (Tr.1 at 126-27; Tr.2 at 244, 248).

Her responsibilities changed over time. In the beginning of her employment, the family lived at 7 Hemlock Road, Manhasset, N.Y. (Tr.2 at 274; see Tr.3 at 395). Plaintiff described the house as a three-bedroom, two bath home, with a kitchen, living room, dining room and a separate space where she lived, with her own bedroom and bath. (Tr.2 at 275; but cf. Tr.3 at 396

---

[9] Four witnesses testified at trial: plaintiff, defendant Yang, defendant Lee, and Pastor Seong Min Ko, the pastor of the church plaintiff attended while employed by defendants. Pastor Ko's testimony (Tr.3 at 346-89) is not summarized in this Order because the Court determines that it is irrelevant to the issues at hand.

(defendant Yang indicating that there were four bedrooms and three baths)).  In the fall of 2019, the family sold the Hemlock Road house and moved into defendant Yang's mother's home at 15 Rockwood Road, East Manhasset.  (Tr.2 at 250; see also Tr.3 at 395-96 (defendant Yang indicating that the family moved out of the Hemlock Road house at the end of August 2019 and the house was sold in October 2019)).  Plaintiff testified that this second home was five bedrooms, plus her own which was located in the basement.  (Tr.2 at 275-76).  Defendant's mother occupied the entire first floor which plaintiff was not responsible for cleaning unless the children made a mess.  (Id. at 276).  Instead, the family resided in two bedrooms and two bathrooms on the second floor, eating in the basement kitchen.  (Id. at 276-77).

In describing her childcare responsibilities, plaintiff testified that when she began working for the family in 2015, the older child was three years old and the younger child was only one year old.  (Tr.1 at 128).  In 2018, the beginning of the statutory period for potential recovery, plaintiff was a bit uncertain as to whether and when the younger child was in school.  (Tr.2 at 254).  During her direct examination, plaintiff indicated that starting in 2018,[10] the younger child was not in school, so plaintiff was responsible for caring for her during the day, in addition to doing meal preparation, dishes, grocery shopping, other cleaning, and laundry.  (Tr.1 at 129).  She testified that during this period, she generally started working at 6:40 a.m., prepared breakfast, took care of the smaller child, and sometimes took the older child to school; sometimes defendant Yang would take the older child to school.  (Id. at 130-131).  During this period in 2018, plaintiff testified that she was responsible for preparing breakfast for the children and for defendant Yang; defendant Lee did not usually eat breakfast.  (Id. at 130).  She would then pick up the older child from school sometime after 12:00 noon, take the children grocery

---

[10] Since the NYLL has a six-year statute of limitations, plaintiff was only able to recover for time beginning in 2018.

shopping, and return between 2:00 and 3:00 p.m. depending upon whether she went to Costco or not.  (Id. at 132-33).  She would then put things away, prepare dinner, and feed the children.  (Id. at 134).  Plaintiff testified that defendant Lee was working in her Manhattan office five days a week during 2018, sometimes until 9:00, 10:00, even 11:00 at night, and that she worked from home on the weekends.  (Id. at 135).  According to plaintiff, defendant Lee never cooked, and her husband did not help out.  (Id. at 134-37).

On cross examination, plaintiff admitted that she could not recall if both children were in school or which school they went to in 2018.  (Tr.2 at 254).  Indeed, when pressed, plaintiff agreed that in 2018, both children would leave for school at 7:50 a.m., with the younger daughter finishing school at 1:00 p.m.  (Id. at 255).  She conceded that during the time the children were in school, she had no childcare responsibilities.  (Id. at 256).  She was also unsure as to whether starting in the fall of 2018, both children were in school until 3:00.  (Id. at 256-57).  She did testify that when the younger child attended the Montessori school, she would leave the house to pick the child up at 12:30 when school let out at 1:00 p.m.  (Id. at 256, 258).  She would then care for the children until defendant Yang came home between 7:00 and 7:30 p.m.  (Id. at 257).  At that time, the children would go to their parents.  (Id. at 256).

On Saturdays, there was no set schedule.  During this time in 2018, on Saturdays, she would prepare breakfast for the family and then the children would often go somewhere to play or to visit their grandma.  (Tr.1 at 139; Tr.2 at 207).  Plaintiff claimed, however, that even though the family might be gone, she still had to give the house a thorough cleaning and prepare food for dinner if they came home.  (Tr.1 at 139-40).  She testified that it was understood that Sundays

were her days off[11] and she would often go to a friend's house Saturday night and spend Sunday working at her church.  (Id. at 140-41; Tr.2 at 207).

It was conceded that other changes in the family's life affected plaintiff's responsibilities, although the parties disagreed as to certain aspects of those changes.  In 2019, the family undertook some renovations to prepare the Hemlock house for sale.  (Tr.2 at 207-08).  During the four-month period of renovations, plaintiff claimed that the family moved into defendant Yang's mother's home, leaving plaintiff in the Hemlock location while the renovations and staging of the house were underway.  (Id. at 208).[12]  Plaintiff testified that she moved into a very small space during the remodeling and spent a "lot more hours" packing up household items, moving things, and taking out the garbage.  (Id.)  During this time, the children continued to swim in the family pool, making "a lot more" laundry, including large towels.  (Id. at 208-09).  Although plaintiff testified that she was required to undertake additional tasks related to the renovations, defendants disputed that testimony.  (Compare Tr.1 at 147-48, with Tr.3 at 416-17, 508-09).

Eventually, plaintiff moved into defendant Yang's mother's home with the rest of the family, and the Hemlock home was sold.  (Id. at 150).  After the family moved to defendant Yang's mother's house, both children began taking the bus to school and since the bus stop was directly in front of the home, plaintiff no longer had to take them to school or pick them up after school, although she testified that at times she took them to after-school activities, including tennis and Kumon.  (Tr.2 at 209-10; see also Tr.3 at 407 (defendant Yang testifying that when

---

[11] This testimony contradicted the allegation in the Complaint that she worked fourteen hours a day on weekdays, twelve (12) hours a day on Saturdays, and four (4) hours a day on Sundays, until January 2023, after which she did not work on Sundays. (Compare Compl. ¶¶ 11, 12).
[12] This testimony was contradicted by defendants.  (See discussion infra at 16).

10

the younger child began elementary school in September 2020, both children took the bus, and the bus stops were only a few feet from both houses)).

In 2020, the COVID pandemic hit. During this time, both individual defendants were working from home, and the children were attending school remotely. (Tr.1 at 152, 158; Tr.2 at 258-59). During this period, plaintiff testified that while she continued to prepare the children's meals and do other household chores, there was no dedicated period of time when she was solely responsible for the children. (Tr.2 at 259-60). She claimed that she spent more time running errands and working for defendant Lee's clothing business.[13] (Tr.1 at 153; Tr.2 at 259).

When the children returned to school in April 2021, the children again took the bus to and from school. (Tr.1 at 162). During the time the children were in school, plaintiff continued to do the usual household work, cooking, laundry, dishes, cleaning the house, doing the grocery shopping, and helping defendant Lee with her business. (Id. at 162-63). Both the individual defendants continued to work from home; defendant Yang began working for his wife's business, and plaintiff claimed that she continued to do a lot of work for the business as well. (Id. at 163-64). In addition to unpacking and repacking the boxes that defendant Lee received from Amazon, and ironing or steaming any clothes to be returned, plaintiff claimed that she took photographs of defendant Lee trying on various clothes, and four times a year, plaintiff would assist defendant Lee with a photo shoot in Manhattan. (Id. at 162, 165-67). According to plaintiff, the photo shoots generally lasted four to five days and involved plaintiff driving Ms. Lee and various clothing, equipment, and props for the shoots to and from Manhattan. (Id. at 167). Once there, plaintiff alleges she would help out in the studio, taping shoes to protect the

---

[13] Defendant Lee disputed that plaintiff spent time during COVID working on business-related tasks, testifying that during COVID, the business essentially shut down; there were no deliveries and employees were furloughed. (Tr.3 at 510-11).

soles, and steam ironing and sorting clothes for the models to wear.  (Id. at 165).  Plaintiff testified that she often left at 6:00 a.m. and returned after 9:00 p.m. on days when the photo shoots were happening.  (Id. at 166-67).  After the shoots, plaintiff would clean and repackage items to be returned, such as shoes.  (Id. at 168).

In the period following the end of COVID, plaintiff testified that the children left for the school bus shortly before 8:00 a.m. and returned from school at 3:00 p.m., and that she was responsible for the hour it took to make breakfast and clean up, starting at 7:00 a.m., plus the four to four and half hours after they returned home until their father came home at 7:00 to 7:30 p.m.  (Tr.2 at 266-67).  During the rest of the day, plaintiff performed the various household chores that she was responsible for.  (Id.)  With respect to the housework she was required to do, plaintiff testified that initially, she did the laundry three or four times a week until Ms. Lee told her she was doing it too often.  (Tr.1 at 137).  She would be responsible for washing, drying, folding, and putting the clothes away, although at times defendant Yang would put the clothes away.  (Id. at 138-39).  On cross examination, she conceded that she did not do the laundry every day, and she estimated that it took her approximately 40 minutes to do the laundry, explaining that she would do other things during this time.  (Tr.2 at 279-81).

She further estimated that on average it took her 30 minutes to clean the family's two bathrooms, which she did not do every day but only whenever they were dirty.  (Id. at 280).  She was unable to estimate exactly how much time she spent vacuuming, although she testified at one point that it took her an hour.  (Id. at 281).  She went grocery shopping four times a week, sometimes while the children were in school, and sometimes she would take the children with her.  (Id. at 289).

Both parties conceded that there were times during the summers in particular when the children were away at camp or the family was on vacation that plaintiff's childcare responsibilities were reduced. (Tr.1 at 142-44). Plaintiff was unclear whether in 2018 the children attended summer school or camp, but she did testify that she spent more time with them during the summer and took them on playdates. (Id. at 143-44). Although she never traveled with the family and was left at the house when they traveled, she claimed that she was required to do a deep clean of the house during these periods, that would generally take her three days, after which she had only "light work" to do. (Id. at 144-45). This was disputed by the defendants, who testified that plaintiff was free to do as she pleased during these times, spending more time at her church and taking long walks. (E.g., Tr.3 at 442).

B. Defendant Yang's Testimony

Defendant Steven Yang testified that at the time of trial, he was employed by his wife's company, Keeper Holdings, Inc., in charge of accounts payable and accounts receivables. (Tr.3 at 391). Before COVID, between 2018 and 2020, he worked at a vocational school in the Bronx. (Id. at 401).

He testified that in 2015, he and his wife were looking for a nanny, who could work out of their home five days a week to care for their young children, dropping off and picking up the children from school and daycare. (Id. at 392-94). He testified that it was agreed that in exchange for a weekly salary, plaintiff would be responsible for childcare and light housework, such as the laundry, tidying up the house, and preparing meals. (Id. at 394-95). In other words, "her job was task-based." (Id. at 448; see also id. at 548 (defendant Lee confirming the job was "task-based")). Her salary did not change from week to week based on the hours worked. (Id. at 395, 448). According to defendant, plaintiff's salary was based on her responsibilities, which she did at her discretion, with no expectation that she would work a fixed number of hours. (Id.

13

at 395, 447-48). Indeed, he conceded on cross examination that nobody tracked plaintiff's work hours.  (Id. at 449).

Defendant Yang testified that in the beginning of 2018, his older daughter attended Our Lady of Grace Catholic School, and the younger daughter was also attending school at the same place.  (Id. at 397-98).  Both children began school at 8:30 a.m., with the older daughter's day ending at 3:00 p.m.; the younger daughter, who was only three at the time, ended school at 1:00 p.m.  (Id. at 398). When the younger daughter turned four in 2018, that semester she began staying in school until 3:00 p.m.  (Id.)  In September 2019, the older daughter began attending kindergarten at Salem Elementary school.  (Id. at 399).  The children's school schedules remained consistent up through 2024.  (Id. at 400).  Defendant Yang testified that during the summer of 2018, both daughters went to summer camp Monday through Friday from 9:00 a.m. to 3:00 p.m., beginning in July.  (Id. at 400-01).

According to defendant Yang, the morning routine in 2018 was that he would help the children dress, have breakfast with the children, and for the beginning of 2018, he would drop off his wife at the train and take both daughters to school.  (Id. at 401, 404).  He would generally return home from work around 7:00 p.m.   (Id. at 401).  During the period prior to COVID, defendant testified that Ms. Wang was responsible for picking up the younger child from school at around 1:00 p.m., running errands until the older one was picked up at 3:00 p.m., and then staying with the children until he got home at 7:00 p.m.  (Id. at 403).  For the period beginning September 2018, she would pick them both up at 3:00 p.m.  (Id.)  According to defendant, the younger child's school was a five- to ten-minute drive from home.  (Id. at 406).

Defendant Yang testified that from January 2018 until June 2018, plaintiff was responsible for childcare only from 1:00 p.m. until 7:00 p.m., including picking up the older

daughter from school at 3:00 p.m. (Id. at 408). Then, beginning in July 2018 when the children were at summer camp, plaintiff was responsible for both children from 3:00 until 7:00 p.m. – "four hours" a day, Monday through Friday. (Id.) This continued until the start of the COVID lockdowns. (Id. at 408-09).

According to defendant Yang, plaintiff was responsible for vacuuming the house, doing the laundry, and cleaning bathrooms. (Id. at 404). She was also responsible for preparing a light breakfast, but this was her only early morning duty. (Id.) He testified that she was not given a list of specific tasks, nor was she required to finish any tasks by a particular time. (Id. at 405). "She had full discretion to do what she wanted during the school day and she only had to be there to pick [the children] up." (Id.) During the time the children were in school, she could have performed housecleaning tasks or taken a nap; there was "no expectation." (Id.) Also, during after school hours, the children watched cartoons, and plaintiff was free to do other things. (Id. at 409).

Defendant testified that he only saw her cleaning the bathrooms every two weeks, doing the laundry no more than twice a week, changing the bedding once a month, and doing grocery shopping once a week. (Id. at 411). Defendant Yang testified that Saturdays were family time so they would visit relatives or go on outings with the children, "[s]o she would have the opportunity to do housekeeping at that time," usually until noon, after which "she would . . . do whatever she wanted." (Id. at 412). She was not mandated to do work on Saturdays, except making breakfast and lunch. (Id. at 413). On "Sundays she was gone." (Id.) She did not do any work on Sunday in the evenings. (Id. at 414). According to defendant, plaintiff never complained about excessive hours during 2018. (Id. at 406).

15

With respect to the renovations necessary to prepare the Hemlock house for sale in 2019, defendant Yang testified that they replaced the rugs, redid two bathrooms, and changed out the kitchen appliances.  (Id. at 415).  However, contrary to plaintiff's testimony, defendant Yang stated that the family stayed in the home during that time because the older daughter was taking the bus to school until June, and after that they stayed so the children could use the pool.  (Id. at 415-16).  While they did move out the children's toys and clutter, they stayed in the Hemlock residence until school started in September.  (Id. at 416).  He denied ever asking plaintiff to assist with the renovations, but conceded that she may have cleaned up dust and helped with the packing.  (Id. at 416-17).

From October 2019 through the rest of the relevant period, the family and plaintiff lived with defendant Yang's mother at 15 Rockwood.  (Id. at 417-18).  He explained that his mother would clean the floor that she lived on so plaintiff was not responsible for cleaning that area.  (Id. at 419-20).  As for the space occupied by the family, defendant testified that plaintiff was responsible for the two large attic bedrooms and two baths and the kitchen, dining area in the basement area.  (Id. at 421).  During COVID, both parents worked from home and the children attended school remotely.  (Id. at 422).  Defendant Yang testified that, during this time, his wife had to lay off employees and all her orders and shipping were canceled.  (Id. at 423-24).  As for plaintiff, he testified that she had less work to do; her housekeeping responsibilities shrank because the family's living space was much smaller than at the Hemlock house, and she did not watch the children exclusively because the parents were home and their grandmother was home as well.  (Id. at 421-22).  Based on his observations, defendant Yang testified that plaintiff would "watch a lot of TV . . . like that throughout the day," and go on walks.  (Id. at 424-25).  Since

both he and his wife were working from home, plaintiff could not vacuum, but she still prepared meals for the family.  (Id. at 425).

After COVID lockdowns ended, defendants continued to work from home, but the children went to summer camp in July 2020. (Id. at 427).  In September, they returned to school in person.  (Id.)  After COVID, plaintiff would make breakfast and reheat leftovers for lunch; she could do laundry but not vacuum when the parents were working.  (Id. at 429).  Defendant Yang testified that plaintiff would take walks, play the violin, go golfing, and was very active in church.  (Id.)  She would also help out with after school activities as the children got older, and prepare dinner.  (Id. at 430-31).  Defendant Yang reviewed various entries from plaintiff's journal, opining that the hours she claimed to have worked were not consistent with what he observed and stating that she did not appear to be working very long hours; "[s]he had a very comfortable schedule."  (Id. at 444).

### C. Defendant Lee's Testimony

Defendant Lee also testified that she was the owner and designer of a clothing business, Keeper Holdings, doing business as the brand Heartloom, which she founded in 2008.  (Tr.3 at 497-98).  She testified that the company sells to about 200 boutiques across the country, along with sales to major retailers.  (Id. at 498).  She denied that plaintiff was ever an employee of Keeper Holdings.  (Id. at 499).  According to defendant Lee, the company has its corporate headquarters at 611 Broadway and contracts with a third-party warehouse that stores all of the merchandise and ships it out to customers.  (Id.)

Defendant Lee confirmed that plaintiff was hired primarily as a nanny and housekeeper, but that after COVID, plaintiff began helping her with samples and merchandise because Lee was working from home.  (Id. at 499-500).  When she was originally hired, plaintiff was

watching the children, grocery shopping, cleaning, doing laundry, and preparing meals.  (Id. at 500-01).

Defendant Lee testified that from 2018 to 2019, plaintiff was not given instructions as to what she was to do each day; "[i]t was more like an understood thing."  (Id. at 501).  She denied ever giving plaintiff a list of tasks to complete each day or each week.  (Id. at 502).  She confirmed her husband's testimony that plaintiff was to care for the children when they came home from school until her husband got home.  (Id. at 503).  Defendant Lee further testified that plaintiff was not required to work during the time the children were in school; as long as she completed her weekly tasks of laundry and cleaning, she could leave the house or sleep if she wanted to while the children were in school.  (Id. at 504-05).  According to defendant Lee, she never directed plaintiff to work on Saturdays; if she worked on Saturdays, that was "[h]er choice," and she was not around on Sundays.  (Id. at 505-06).

Defendant Lee denied that she had samples delivered to her home prior to COVID.  (Id. at 506).  She testified that when they moved to Mr. Yang's mother's home, it reduced plaintiff's hours because his mother would watch the kids.  (Id. at 508).  She denied ever requiring plaintiff to assist with the renovations in the Hemlock home, nor was she required to do any special cleaning during that time.  (Id. at 508-09).  She testified that during COVID, nothing was being delivered to the home; staff was furloughed; and most of her day was spent online, dealing with cancelled orders and requests for discounts.  (Id. at 510-11).  It was not until the 2020 holidays that the business started to get back to normal.  (Id. at 511).  According to defendant Lee, plaintiff's responsibilities were less during COVID because the children were at home attending remote school, supervised by their parents; she testified that she did not know what plaintiff was doing because plaintiff tended to stay in her basement apartment.  (Id. at 512).

18

After COVID, defendant Lee testified that she would ask plaintiff to help tidy up her room since she continued to work from home, and she would have samples all over the place. (Id. at 514-15). She would ask plaintiff to put the samples in boxes, "[m]aybe like two or three times a week," but it would not take long, "[m]aybe like 30 minutes." (Id. at 515). She testified that the amount of boxes depended upon the season, with one box coming maybe two, three times a week. (Id. at 516). The number of items in each box would depend on the type of item. (Id. at 517). She denied shipping Heartloom clothing from her home to customers, noting that the shipments would be made from the company's fulfillment warehouse. (Id. at 517-18). She did ask plaintiff to help out with photo shoots when Ms. Lee had props, such as shoes or handbags. (Id. at 520). She stressed that these shoots occurred four times a year and plaintiff would only come on the first and sometimes the last day, and she would do this instead of watching the children and making meals. (Id. at 520-21). Infrequently, defendant Lee would try on a garment and ask plaintiff to take a photo of her wearing the garment to help the design process, but often defendant Lee would just take a selfie or ask one of her family members to take a photo. (Id. at 521-22). Defendant Lee denied that plaintiff was ever placed on Keeper Holdings' payroll and testified that the tasks she did were "occasional and situational." (Id. at 523).

IV.    The Charge to the Jury

Among the charges given to the jury, the jury was instructed that under the New York Labor Law, an employer is required "to keep accurate and detailed records of the hours each employee works each day, including the total number of hours each employee worked each week including the number of overtime hours, if any; the wages each employee was paid; the dates of employment; the employee's regular rate of pay; and any deductions from wages." (Tr.3 at 601); e.g., Santillan v. Henao, 822 F. Supp. 2d 284, 294 (E.D.N.Y. 2011). It is well established that in

19

the absence of such records, "the plaintiff is permitted to prove the number of hours she worked through other sorts of evidence." (Tr.3 at 602). The jury was told that it could determine the number of hours plaintiff worked based on plaintiff's own recollection and the jury's own reasonable inferences drawn therefrom. (Id.) "Unlike employers, employees are not required to keep detailed records or, indeed, records of any kind." (Id.); Santillan v. Henao, 822 F. Supp. 2d at 294. Thus, the jury was instructed that "the law does not require the plaintiff to remember her exact hours per week or the wages she received, so long as there is a reasonable estimate of the dates and hours she worked and the pay she received," which the jury may use as the basis of their findings. (Tr.3 at 602); see Feng v. Kelai Corp., 727 F. Supp. 3d 423, 444 (S.D.N.Y. 2024), appeal dismissed (June 13, 2024). Although "the employee's recollection must be more than mere speculation," it "need not be precise and may consist solely of an approximation of the hours that she worked." (Tr.3 at 602); see Feng v. Kelai Corp., 727 F. Supp. 3d at 444.

The jury was also instructed that "[o]nce the plaintiff presents evidence that provides reasonable estimates of dates and hours worked and the pay received, the burden shifts to the defendants to demonstrate by a preponderance of the evidence that they, in fact, properly paid their employees." (Tr.3 at 602-03); see Chichinadze v. BG Bar Inc., 517 F. Supp. 3d 240, 253 (S.D.N.Y. 2021). "Under the New York Labor Law, defendants must do more than merely suggest that plaintiff's recollections of her hours worked and pay received are unreasonable." (Tr.3 at 603); see Gamero v. Koodo Sushi Corp., 272 F. Supp. 3d 481, 498 (S.D.N.Y. 2017), aff'd, 752 F. App'x 33 (2d Cir. 2018). "[R]ather, defendants must meet the more demanding burden of showing by a preponderance of the evidence that plaintiff was, in fact, properly paid for the hours she worked." (Tr.3 at 603); see N.Y. Lab. Law § 196-a(a) (stating that "the employer in violation shall bear the burden of proving that the complaining employee was paid

wages, benefits and wage supplements"). The jury was instructed that the "defendant may offer records establishing the precise number of hours the plaintiff worked, or testimonial or other evidence to establish by a preponderance of the evidence that contrary to plaintiff's testimony plaintiff was properly compensated." (Tr.3 at 603); see, e.g., Hernandez v. Jrpac Inc., No. 14 CV 4176, 2016 WL 3248493, at *3-7 (S.D.N.Y. June 9, 2016) (after a bench trial, crediting plaintiffs' recollection of their hours and finding defendants' alleged employment records, including payroll records, time sheets, etc., were incredible where the records were inconsistent with credible testimony); Jiao v. Shi Ya Chen, No. 03 CV 165, 2007 WL 4944767, at *7 (S.D.N.Y. Mar. 30, 2007) (after a bench trial, crediting plaintiff's recollection of the amount and extent of his work and finding defendant failed to sufficiently rebut that recollection under the FLSA (a lower burden of proof) where defendant had "not provided any records establishing the precise number of hours [plaintiff] worked" nor any other "testimonial or other evidence sufficient to convince the Court that, contrary to his sworn statements, [plaintiff] actually worked only 30.5 hours a week"). "However, these records or other evidence must be credibly corroborated by testimony or other evidence." (Tr.3 at 603); see, e.g., Hernandez v. Jrpac Inc., 2016 WL 3248493, at *3-7; Jiao v. Shi Ya Chen, 2007 WL 4944767, at *7.

In this case, plaintiff claimed, and defendants did not dispute, that the defendants had not maintained the necessary records required by the law. During deliberations, the jury was permitted to consider Plaintiff's Exhibit 2 (plaintiff's handwritten journals covering the latter period of employment, from July 25, 2022 through January 15, 2024) and Plaintiff's Exhibit 3 (the certified English translation of the journals) (Tr.3 at 609), both of which were admitted into evidence under Federal Rule of Evidence 807, the residual exception to the rule against hearsay. (Tr.2 at 315-17). The jury was also permitted to consult Plaintiff's Exhibit 6, a chart the

plaintiff's attorney prepared that interpreted plaintiff's journal entries and purported to calculate the hours plaintiff worked each day.  However, the Court emphasized to the jury that, unlike the journal and translation, Plaintiff's Exhibit 6 was not in evidence and should not be treated as such.  (Tr.3 at 609-10).

V.    The Jury's Verdict

To assist the jury in reaching a verdict, the jury was given a special verdict sheet which asked the jury to answer five questions and to fill out a supplemental verdict sheet.  Question 1 asked the jury:  "Has the plaintiff established, by a preponderance of the evidence, that the corporate defendant, Keeper Holdings, Inc. ("Keeper Holdings"), was plaintiff's "employer" under the New York Labor Law for any period between January 30, 2018 to January 15, 2024?"  On the verdict sheet, the jury checked "NO."  Question 1(a), which was to be answered only if the jury selected "YES" to Question 1, was appropriately left unanswered.

For Question 2, which asked "How many hours did plaintiff prove by a preponderance of the evidence that she actually worked for each week between January 30, 2018 and January 15, 2024?" the jury was instructed to fill out the comprehensive week-by-week chart prepared by the plaintiff, titled the "Supplemental Verdict Sheet," to "determine week by week the number of hours plaintiff worked."  The answers on the supplemental verdict sheet will be discussed in more detail below.

For Question 3, which asked "Did the plaintiff prove, by a preponderance of the evidence, that she worked more than 44 hours in any week during the course of her employment?" the jury checked "YES."

For Question 4, which asked "Did the plaintiff prove, by a preponderance of the evidence, that on any given day the start time and end time of her workday were more than 10 hours apart and she was not paid the required additional 'spread of hours' compensation?" the

22

jury checked "YES." Having answered "YES" to Question 4, the jury was asked to answer Question 4(a): "If you answered 'Yes' to Question 4, on what days did plaintiff's workday span 10 or more hours?" The jury was again directed to fill out the supplemental verdict sheet, this time "indicating the number of days per week plaintiff worked a spread of more than 10 hours and was not paid 'spread of hours' pay."

Question 5 asked: "To the extent that the defendants failed to compensate plaintiff the applicable overtime wages, did defendants prove, by a preponderance of the evidence, that they had a good faith basis to believe that their underpayment of wages was in compliance with the law?" On the verdict sheet, the jury answered this question "YES."

A.    The Supplemental Verdict Sheet

On the supplemental verdict sheet, consisting of a week-by-week chart of the period at issue, the jury determined that the plaintiff worked between 44 and 50 hours per week for several distinct time periods. Specifically, the jury determined that for the week starting 1/30/2018 through the week starting 12/24/2018 (a total of 48 weeks), the plaintiff consistently worked 50 hours per week. Given that under the NYLL, employees who live where they work only become eligible for overtime after they work 44 hours in a workweek, see 12 N.Y.C.R.R. § 142-2.2, the jury's finding would be equal to six (6) hours of overtime per week.

For the week starting 12/31/2018 through the week starting 6/24/2019 (a total of 26 weeks), the jury found that plaintiff worked 45 hours per week, or one hour of overtime per week. The jury's determination that plaintiff worked more overtime hours during the first period of time is consistent with defendant Yang's testimony that in the beginning of 2018, the younger

child was in school until 1:00 p.m.,[14] after which plaintiff was responsible for picking her up and watching her until Yang returned from work at 7:00 or 7:30 p.m. (Tr.3 at 403; see also Tr.2 at 257).[15] During the later part of 2018, when both children were in school until 3:00 p.m., it was undisputed that plaintiff picked up both children from school at 3:00 p.m., resulting in a reduction of plaintiff's childcare hours[16] in the second time period, which would be consistent with the jury's determination to reduce plaintiff's total weekly hours.

For the week starting 7/8/2019 through the week starting 8/26/2019 (a total of 9 weeks), the testimony showed that the children were at summer camp during the day, and the jury found that during this time, the plaintiff worked 44 hours per week. For the week starting 9/2/2019 through the week starting 3/9/2020 (a total of 29 weeks), the jury found that plaintiff worked 45 hours per week. This finding was consistent with their analysis of the earlier period – 12/31/2018 through the week starting 6/24/2019 – when the children were in school until 3:00 p.m.

For the week starting 3/16/2020 through the week starting 7/18/2022 (a total of 125 weeks), the jury found that plaintiff worked 44 hours per week. The testimony shows, and the Court takes judicial notice of the fact that, during this time period the COVID-19 pandemic was

---

[14] As noted supra at 8-9, plaintiff originally testified that while she was uncertain if the younger child was in school at all in 2018 (Tr. 1 at 129), on cross examination, she conceded that the younger child was in school until 1:00 p.m. (Tr.2 at 254, 256).

[15] If the jury credited the testimony that the younger child was in school until 1:00 p.m. in the beginning of 2018, that meant that plaintiff was responsible for childcare for six to six and one half hours in the afternoon until their father came home, and one hour in the morning when she prepared their breakfast and cleaned up afterwards for a total of seven to seven and a half hours per weekday, not including time for light housework. During the second and later time periods when both children were in school until 3:00 p.m., plaintiff's childcare responsibilities were four to four and a half hours in the afternoon and one hour in the morning, not accounting for household tasks, for a total of five to five and a half hours per weekday.

[16] There is no dispute that plaintiff was also required to perform certain household tasks, such as cooking, cleaning, grocery shopping, and driving the children to classes and after school activities. The parties, however, disputed how much time during any given day those tasks would have taken, particularly given plaintiff's testimony that she could do certain tasks while also watching the children.

24

at its height.  It was not disputed that during this period, defendants were working from home; the children were attending school remotely; and plaintiff's childcare tasks were reduced.

For the week starting 7/25/2022, when the pandemic had subsided somewhat and the children's normal summer and fall activities resumed, through the week starting 1/8/2024 (the end of plaintiff's employment) (a total of 79 weeks), the jury found that plaintiff worked 48 hours per week; this would be equal to four (4) hours of overtime per week.  In this period following the end of COVID, plaintiff's testimony about the hours of childcare she was required to perform could have been reasonably interpreted by the jury to be limited to approximately 25 to 27.5 hours of childcare per week.  (See Tr.2 at 266-67).

Plaintiff's attorney claimed that throughout the entire relevant period plaintiff worked almost every Saturday, with Plaintiff's Exhibit 6 interpreting plaintiff's journals to say that plaintiff worked an average of 9.85 hours, or a median of 10.33 hours, each Saturday during the period of time she kept a journal, from 7/25/2022 through 1/15/2024.  (See Tr.1 at 139-42 (plaintiff's testimony explaining that in 2018, she spent Saturdays preparing breakfast then doing a deep clean of the house, finishing either at 4:00 p.m. if the family went out to dinner or 8:00 p.m. if she had to prepare their dinner); Tr.2 at 207, 264-65 (plaintiff's testimony explaining that for the entire relevant period, she prepared breakfast on Saturday mornings, watched the children until around 12:00 p.m., and then cleaned and sometimes prepared dinner)).  However, given defendants' testimony that plaintiff worked only in the mornings on Saturdays, with no expectation that she would work any hours at all that day (see Tr.3 at 411-13, 468, 505), the jury could have reasonably found that plaintiff worked only a few hours each Saturday.  Such a finding could have contributed to the jury's finding that plaintiff worked fewer hours per week than she claimed in Exhibit 6.

In sum, the jury determined that for 182 weeks of plaintiff's employment, she worked at least 45 hours per week (with at least one hour of overtime per week), and for the 134 weeks during the pandemic, she worked 44 hours per week (with no overtime).

On this same chart, the jury also made a determination regarding the "number of days per workweek that plaintiff worked a spread of more than 10 hours and was not paid spread-of-hours pay." For the week starting 1/30/2018 through the week starting 3/9/2020, the jury found that for 5 days per weekly period, plaintiff worked a spread of more than 10 hours and was not paid spread-of-hours pay, indicating that these 5 days were "M-F" – Monday through Friday.

For the week starting 3/16/2020 through the week starting 7/18/2022 including the period of the pandemic, the jury found that there were zero days per weekly period that plaintiff worked a spread of more than 10 hours and was not paid spread-of-hours pay.

For the week starting 7/25/2022 through the week starting 1/8/2024 (the end of plaintiff's employment), the jury found that for 5 days per weekly period, plaintiff worked a spread of more than 10 hours and was not paid spread-of-hours pay, indicating again that these 5 days were Monday through Friday.

## VI.  Damages Calculations

Based on the jury's findings of fact from the verdict sheet and supplemental verdict sheet, as discussed above, the Court calculated damages as follows.

### A.  Calculating Plaintiff's "Regular Rate" of Pay for Minimum Wage and Overtime Damages

In order to calculate damages based upon the jury's findings, the Court must first determine the plaintiff's "regular rate" of pay. On December 19, 2025, the Court directed the parties to provide post-trial briefing by December 22, 2025 regarding the issue of whether, for purposes of calculating minimum wage and overtime damages under the NYLL, the "regular

rate" is calculated by: 1) dividing the weekly salary by the total hours worked each week, such that the regular rate fluctuates depending on the week, or 2) by dividing the weekly salary by a fixed number of hours, *e.g.*, 44, the presumed number of hours in a workweek for a residential employee for purposes of calculating overtime hours.  (See Electronic Order, dated December 19, 2025).

### 1. Standard Workweek for Residential Employees

In order to calculate damages under the NYLL, the Court considered the provision applicable to residential employees because it was undisputed that plaintiff lived in defendants' home during the course of her employment.  Under the NYLL, employees who live where they work "become eligible for overtime after 44 hours worked in a workweek, whereas those who are non-residential become eligible for overtime after 40 hours worked in a workweek." Shillingford v. Astra Home Care, Inc., 293 F. Supp. 3d 401, 413, 418 (S.D.N.Y. 2018) (citing 12 N.Y.C.R.R. § 142-2.2).  Thus, an employer must pay their residential employee at least the minimum wage for the first 44 hours worked in a week.  See id.  For any hours worked over 44 in a week, the employer must pay their residential employee overtime compensation at a rate of one-and-one-half times the employee's regular rate.  See id.; 12 N.Y.C.R.R. § 142-2.2.

### 2. Calculating the "Regular Rate" of Pay

#### a. The Parties' Positions

The parties dispute the method for calculating plaintiff's regular rate of pay in order to determine whether plaintiff was properly paid minimum wages and overtime.  This Court had reserved decision as to "whether a presumption applies that plaintiff's weekly salary covers only the first 40 hours of work."  (ECF No. 48 at 5).

Defendants rely on 12 N.Y.C.R.R. § 142-2.16 to argue that the plaintiff's "regular rate of pay" is calculated by dividing plaintiff's weekly pay of $750 by the total number of hours

plaintiff worked in a week. (ECF No. 47). Plaintiff agrees that under the NYLL, for non-hospitality workers, the regular pay rate is generally calculated in this manner. (ECF No. 46). However, plaintiff contends that under the NYLL and FLSA, there is a rebuttable presumption that a weekly salary covers only the first 40 weeks of work, unless the parties have agreed otherwise.[17] (Id. (citing Ahn v. Sun Cleaners Inc., No. 19 CV 5919, 2022 WL 586022, at *7 (E.D.N.Y. Feb. 18, 2022); Pinovi v. FDD Enters., Inc., No. 13 CV 2800, 2015 WL 4126872, at *4 (S.D.N.Y. July 8, 2015))). Thus, plaintiff argues that this presumption should apply in this case to calculate the regular rate of pay.

In Ahn, the case relied upon by the plaintiff, a delivery worker for a dry cleaner brought claims under the FLSA and NYLL for unpaid overtime and spread-of-hours pay. 2022 WL 586022. When defendants defaulted, the court was asked to consider what the employee's regular rate of pay was in order to determine damages. Acknowledging that under the NYLL, the regular rate of pay is determined by dividing the weekly salary by the total hours worked during the week, the Ahn court nonetheless explained that "[b]oth the NYLL and the FLSA . . . carry a rebuttable presumption that a weekly salary covers only the first 40 hours of work, unless the parties have agreed otherwise." Id. at *7-8 (citing Pinovi v. FDD Enters., No. 13 CV 2800, 2015 WL 4126872, at *4 (S.D.N.Y. July 8, 2015) (collecting cases); Giles v. City of New York, 41 F. Supp. 2d 308, 317 (S.D.N.Y. 1999)). The Ahn court stated that, while an employer may rebut the presumption by producing a written agreement or a memorandum summarizing an oral agreement to the contrary, in the absence of such evidence, the "'entire course of [the parties']

---

[17] The testimony at trial made it clear that there was no agreement between the parties as to how many hours the plaintiff's salary was intended to cover. (See discussion supra at 7, 13). The evidence from the witnesses was that plaintiff's job was task-based and no particular hours were discussed. (Id.) Although plaintiff argues that the jury should have been asked how many hours the salary was intended to cover (Pl.'s Supp. Mot. at 2), there was no testimony or other evidence upon which a reasonable jury could make such a determination. Any response would be purely speculative.

conduct, based on the testimonial and documentary evidence in the record,'" may be considered in determining what the parties understood the agreement to be.  Id. at *8 (quoting Jiao v. Shi Ya Chen, No. 03 Civ. 0165, 2007 WL 4944787, at *13 (E.D.N.Y. Mar. 30, 2007).  However, "'[e]vidence of only one party's intention or understanding will not be enough.'"  Id. at *8 (quoting Saldarriaga Saldarriaga v. IND Glatt, Inc., No. 17 CV 02904, 2019 WL 1332887, at *4 (E.D.N.Y. Mar. 25, 2019)).

In Ahn, because the defendants had defaulted and not appeared to present any evidence, the court accepted plaintiff's testimony that there were no set hours of work, concluding that, in the absence of any evidence of a mutual understanding between employee and employer as to the number of hours intended to be covered by his weekly salary, the presumption that the weekly salary covered only his first 40 hours applied.  2022 WL 586022, at *8.  Cf. Hernandez v. J & M Corona Deli Corp., No. 23 CV 9120, 2025 WL 2597767, at *8-9 (E.D.N.Y. Aug. 13, 2025) (finding the presumption did not apply where it was reasonable to infer from the parties' course of conduct that they intended the weekly salary to compensate plaintiff for the 56 hours plaintiff regularly worked each week), report and recommendation adopted, 2025 WL 2591538 (E.D.N.Y. Sept. 8, 2025).

Defendants counter that Ahn and Pinovi are inapplicable here, where plaintiff has agreed to dismiss her single claim under the FLSA at the close of trial, because both of those cases involved either FLSA or hybrid FLSA/NYLL claims.  (ECF No. 47).  Instead, defendants cite several recent cases in this district in which courts have adhered to the regulatory text of 12 N.Y.C.R.R. § 142-2.16, which does not presume a 40-hour work week.  See Albim v. 1656 Wireless Inc., No. 23 CV 1732, 2025 WL 2791384, at *10 n.11 (E.D.N.Y. Sept. 8, 2025) (expressly rejecting plaintiffs' attempt to calculate the regular rate by dividing a fixed weekly

salary by 40 hours, holding that such a method is "the method of calculation permitted for hospitality employees pursuant to the NYLL Hospitality Industry Wage Order" and does not apply to non-hospitality employees); see also Kim v. J&J Safetymate Corp., No. 22 CV 1070, 2025 WL 1384135, at *4 (E.D.N.Y. May 13, 2025) (in a case where the parties dismissed all FLSA claims and went to a bench trial only on damages for the NYLL claims, calculating the regular rate for non-hospitality worker plaintiff by using the method in 12 N.Y.C.R.R. § 142-2.16, with no mention of a 40-hour presumption); Sanchez v. Ms. Wine Shop Inc., 643 F. Supp. 3d 355, 375-76 (E.D.N.Y. 2022) (same, on motion for default judgment in a hybrid FLSA and NYLL case); Jacome v. Optical 49, Inc., No. 20 CV 2615, 2021 WL 3375134, at *9 (E.D.N.Y. July 9, 2021) (same), report and recommendation adopted, 2021 WL 3373130 (E.D.N.Y. Aug. 3, 2021); Perez Campos v. Quentin Mkt. Corp., No. 16 CV 5303, 2018 WL 9945754, at *4 (E.D.N.Y. Oct. 17, 2018) (same).

    b.  <u>Analysis</u>

    The NYLL clearly states that when a non-hospitality employee is paid a salary, "the regular hourly wage rate shall be determined by dividing the total hours worked during the week into the employee's total earnings."  12 N.Y.C.R.R. § 142-2.16.  By contrast, under the NYLL provision for hospitality workers, the regular rate is calculated by "dividing the employee's total weekly earnings . . . by the lesser of 40 hours or the actual number of hours worked by that employee during the work week."  12 N.Y.C.R.R. § 146-3.5(b).  Under the relevant FLSA provision, the regular rate is calculated by "dividing the salary by the number of hours which the salary is intended to compensate."  29 C.F.R. § 778.113(a).  The hospitality worker NYLL provision explicitly mentions 40 hours as the presumed base, and the FLSA provision explicitly discusses relying on the intentions of the parties to determine what the salary was intended to compensate.  The fact that the NYLL non-hospitality provision does not mention 40 hours or the

parties' intentions as a basis for determining the regular rate – particularly where there is such a stark difference in construction between the NYLL hospitality and NYLL non-hospitality provisions – suggests that the New York legislature intended the non-hospitality provision to be interpreted differently from these other provisions.

At first glance, there appears to be a split in the case law that the Second Circuit has not resolved.  Defendants cite 12 N.Y.C.R.R. § 142-2.16 and the cases citing the statute that do not mention any 40-hour presumption, to argue that the regular rate is calculated by dividing the weekly salary by the total hours worked that week.  (ECF No. 49 at 2).  Plaintiff points to Ahn and Pinovi to argue that, regardless of the statutory text, a presumption exists under the NYLL that a weekly salary covers only the first 40 hours worked for purposes of calculating the regular rate.  (ECF No. 50 at 1; ECF No. 46 at 1).  However, tracing the line of cases plaintiff relies upon to their original source reveals that the cases all rely on language quoted in Guallpa v. N.Y. Pro Signs Inc., No. 11 CV 3133, 2014 WL 2200393 (S.D.N.Y. May 27, 2014), report and recommendation adopted sub nom. Guallpa v. NY Pro Signs Inc., 2014 WL 4105948 (S.D.N.Y. Aug. 18, 2014).  Citing an earlier Southern District of New York decision in Giles v. City of New York, 41 F. Supp. 2d 308, 317 (S.D.N.Y. 1999), the Guallpa court stated:  "Under both the FLSA *and NYLL*, . . . there is a presumption that such a weekly salary covers only the first forty hours, unless the parties 'intend and understand the weekly salary to include overtime hours at the premium rate.'"  Guallpa v. N.Y. Pro Signs Inc., 2014 WL 2200393, at *3 (emphasis added) (quoting Giles v. City of New York, 41 F. Supp. 2d at 317).  While the Giles court indeed stated that "[t]here is a rebuttable presumption that a weekly salary covers 40 hours," Giles dealt only with FLSA claims; it did not refer to the NYLL, nor did it conduct an analysis of the comparable language in the NYLL.  41 F. Supp. 2d 308, 317 (S.D.N.Y. 1999).

Guallpa cites three other cases in addition to Giles, but none of them find that there is a 40-hour presumption under the NYLL.  See Guallpa v. N.Y. Pro Signs Inc., 2014 WL 2200393, at *3 (citing Francois v. Mazer, No. 09 CV 3275, 2012 WL 653886, at *4 (S.D.N.Y. Feb. 28, 2012); Amaya v. Superior Tile & Granite Corp., No. 10 CV 4525, 2012 WL 130425, at *6, *9 (S.D.N.Y. Jan. 17, 2012); Wirtz v. Harper Buffing Mach. Co., 280 F. Supp. 376, 381 (D. Conn. 1968)).  At most, these three cases state that there is a 40-hour presumption under the FLSA, see, e.g., Francois v. Mazer, 2012 WL 653886, at *4 (quoting the presumption under the FLSA), or find that, without explicit agreement between the employee and employer, a court may not assume that a weekly salary was intended to compensate the first 40 hours worked at some rate. See, e.g., Amaya v. Superior Tile & Granite Corp., 2012 WL 130425, at *9 (stating that "[t]he fact that Plaintiffs regularly worked more than 50 hours per week does not indicate that the employees' weekly salary was intended to include the overtime premium required by the FLSA and Labor Law," and in a separate section citing Section 142-2.16 to hold that the regular hourly rate "is arrived at by dividing the gross wages each plaintiff received from Defendants for a week by the hours worked by Plaintiffs"). See also Wirtz v. Harper Buffing Mach. Co., 280 F. Supp. 376, 381.  None of these cases explicitly state that there is a presumption under the NYLL that the regular rate should be calculated by dividing the weekly salary by 40 hours.

In light of the uncertain origin of the proposition that under the NYLL, the regular rate for non-hospitality workers is to be calculated according to a presumption of a 40-hour work week, which appears to be the basis for the decisions in Ahn, Pinovi, and other similar cases, the Court declines to follow such cases.  Rather, the Court relies upon the statutory text of NYLL Section 142-2.16 and the robust line of cases citing it, and has calculated the plaintiff's regular rate of pay by dividing plaintiff's weekly salary of $750 by the total number of hours that the

jury found she worked in a week.  See, e.g., Rafter v. Everlast Sign & Serv. Inc., No. 21 CV 4588, 2025 WL 2240446, at *19 (E.D.N.Y. Aug. 6, 2025) (after a bench trial, calculating the regular rate for FLSA and NYLL overtime damages by dividing plaintiffs' weekly pay by the number of hours actually worked, citing 12 N.Y.C.R.R. § 142-2.16); see also Pelico v. SD Auto. Inc., No. 21 CV 4215, 2022 WL 17820136, at *6 (E.D.N.Y. Aug. 25, 2022) (citing Section 142-2.16 to calculate the regular rate, without mentioning a 40-hour work week presumption); Sanchez v. Ms. Wine Shop Inc., 643 F. Supp. 3d at 375-76 (same); Kim v. J&J Safetymate Corp., 2025 WL 1384135, at *4 (same).  Although this approach results in a regular rate that fluctuates depending on the number of hours plaintiff worked in a given week, the Court determines that this approach is more faithful to the statutory language and is supported by the majority of the case law.[18]

---

[18] In an analogous context involving the calculation of regular rates where the employee is paid by the day, courts have held that under the FLSA, the regular rate is calculated by adding the sums earned each day for the entire week, and dividing that by the total number of hours worked in that week.  Courts in that context have found that the method of calculating the regular rate by dividing weekly salary by the total hours worked has "strange consequences": "it gives those workers who work longer hours a lower regular rate."  Kim v. J&J Safetymate Corp., No. 22 CV 1070, 2025 WL 1384135, at *4 (E.D.N.Y. May 13, 2025) (quoting Yin v. Kim, No. 07 CV 1236, 2008 WL 906736, at *3 (E.D.N.Y. Apr. 1, 2008)).  However, "[c]ourts nevertheless are constrained to follow the FLSA regulations."  Id. (quoting Yin v. Kim, 2008 WL 906736, at *3); see also Dufrene v. Browning-Ferris, Inc., 207 F.3d 264, 267-68 (5th Cir. 2000) (deferring to the Department of Labor's interpretation in 29 C.F.R. § 778.112 of how to calculate the regular rate to determine overtime compensation under the FLSA for an employee paid a flat sum for a day's work – namely, by adding all sums received at such day rates in the workweek and dividing this weekly salary by the number of hours worked – even though "the greater the number of hours worked, the lower the regular rate, and, as a result, the lower the overtime compensation"), cert. denied, 531 U.S. 825 (2000); Overnight Motor Transp. Co. v. Missel, 316 U.S. 572, 580 (1942) (holding that, though "[i]t is true that the longer the hours the less the rate and the pay per hour . . . [t]his method of computation [of the regular rate under the FLSA] has been approved by each circuit court of appeals which has considered such problems"), superseded by statue on other grounds as stated in Trans World Airlines, Inc. v. Thurston, 469 U.S. 111 (1985) and Walling v. A.H. Belo Corp., 316 U.S. 624 (1942).  Of course, there are no viable FLSA claims here:  plaintiff's FLSA overtime claim is barred by the live-in domestic worker exemption, and her FLSA minimum wage claim, even had it gone to trial, would not have yielded any recovery because plaintiff's regular rate, by any means of calculation, would not have been less than the federal minimum wage of $7.25 per hour, at any point during the relevant period.  The Court therefore need not determine the regular rate under the FLSA.  Nevertheless, the Court finds the thoughtful, thorough analysis in these other cases regarding this method of calculating the regular rate to be relevant and persuasive, and notes it dovetails with the approach under the NYLL non-hospitality statute, 12 N.Y.C.R.R. § 142-2.16.

A.  Minimum Wage Damages

As a live-in domestic worker, plaintiff is entitled to the difference between her actual compensation and the minimum wage amount for the first 44 hours worked in a week.  In order not to double-count damages, any hours worked in excess of 44 are to be compensated under the overtime provision, as discussed below.  See Lin v. DJ's Int'l Buffet, Inc., No. 17 CV 4994, 2024 WL 4315031, at *5 (E.D.N.Y. Sept. 27, 2024) (holding that "[p]laintiff cannot receive both minimum wage and overtime compensation for hours worked in excess of 40 hours, 'because plaintiff has already been paid' a minimum wage for the first 40 hours worked, and cannot 'double-dip' by receiving both minimum wage and overtime wages" (quoting Sanchez v. Ms. Wine Shop Inc., 643 F. Supp. 3d at 377)); 12 N.Y.C.R.R. § 142-2.2 (explaining that residential workers are entitled to overtime for hours worked in excess of 44 in a week).

During plaintiff's employment, the New York State minimum wage rate increased periodically from $11 to $16 per hour.  After calculating plaintiff's regular hourly rate for each weekly period as set forth above, the Court determines that plaintiff did not earn less than the New York State minimum wage at any point during her employment, except for the final two weeks, where the New York State rate was $16 an hour and plaintiff's regular rate was $15.625, as determined by dividing $750 by the 48 hours that the jury determined she worked.  Plaintiff's minimum wage damages are therefore $33.00.[19]

B.  Overtime Damages

Overtime damages are calculated by subtracting the regular rate from the overtime rate, multiplied by the number of overtime hours worked in that week.  E.g., Rafter v. Everlast Sign &

---

[19] The Court calculates plaintiff's minimum wage damages as follows: divide $750 by 48 hours, to get the regular rate of $15.625; subtract $15.625 from the relevant New York State minimum wage rate of $16 per hour, which results in $0.375; multiply $0.375 by the 44 hours for which minimum wage damages are available, multiplied by 2 weeks, for a total of $33 in minimum wage damages.

Serv. Inc., 2025 WL 2240446, at *33.  As stated above, plaintiff is entitled to overtime as a live-in domestic worker for any hours worked in excess of 44 in a week.

Here, the jury determined that plaintiff's hours worked per week ranged from 44 to 50 over the course of the six years she worked for the defendants.  Taking into account the jury's determinations and the prorated hours as discussed below, the Court determines that plaintiff is entitled to overtime damages in the amount of $4,975.75.[20]

C.  Spread-of-Hours Damages

A plaintiff is entitled to spread-of-hours compensation at the rate of one hour's pay at the basic minimum hourly wage rate, in addition to any other minimum wage or overtime compensation, for any day in which the spread-of-hours worked exceeds 10 hours.  12 N.Y.C.R.R. § 142-2.4.  "The spread of hours is the interval between the beginning and end of an employee's workday" and "includes working time plus time off for meals plus intervals off duty." 12 N.Y.C.R.R. § 142-2.18.[21]  The parties dispute whether plaintiff is entitled to spread-of-hours compensation.

The Court notes that the parties stipulated in the Joint Pretrial Order that:  "The 'spread of hours' provision under the New York Labor Law applies only to workers earning the minimum wage."  (ECF No. 28-1 (citing 12 N.Y.C.R.R. § 142-2.4; Sosnowy v. A. Perri Farms, Inc., 764 F. Supp. 2d 457, 473 (E.D.N.Y. 2011)))  Despite this clear stipulation in the Pretrial Order, plaintiff's counsel now argues that "there was no stipulation between the parties that only if plaintiff received [sic] minimum wage rate, is plaintiff entitled to receive spread of hours."  (ECF

---

[20] For a detailed chart of damages calculations, please see Appendix 1 below.
[21] For example, if an employee begins work at 7:00 a.m. and works until 12:00 p.m., takes a break for lunch and is off-duty for a few hours, then works again from 3:00 p.m. until 7:00 p.m., even though the employee worked only 9 hours, she would be entitled to spread-of-hours pay, because her start and end times were more than 10 hours apart.

No. 50 at 2). Plaintiff's counsel states that before the first day of trial started, he "made that clear to defendants' counsel" that the parties' "previously [sic] stipulation was in error as plaintiff only stipulated that any spread-of-hours pay would be at the minimum wage rate not at whatever the rate the plaintiff was receiving at the time." (Id.) However, as defendants point out, plaintiff "did not seek to withdraw the stipulation, nor did counsel place any objection or clarification on the record." (ECF No. 52).

Notwithstanding the issue of whether plaintiff successfully withdrew, objected to, or clarified the stipulation, the Court proceeds to assess whether plaintiff is, in fact, entitled to any spread-of-hours compensation under the NYLL if she earned more than the minimum wage. The majority of courts in this circuit have held that, for non-hospitality workers, spread-of-hours pay under the NYLL is available only to workers earning at or below the minimum wage. See Sosnowy v. A. Perri Farms, Inc., 764 F. Supp. 2d 457, 474 (E.D.N.Y. 2011); Jenkins v. Hanac, Inc., 493 F. Supp. 2d 556 (E.D.N.Y. 2007); Singh v. Patel, No. 12 CV 3204, 2013 WL 2190153, at *2 (E.D.N.Y. May 16, 2013); Qiu Hua Tan v. Voyage Express Inc., No. 15 CV 6202, 2017 WL 2334969, at *3-4 (E.D.N.Y. May 25, 2017); Luna v. Gon Way Constr., Inc., No. 16 CV 1411, 2017 WL 835321, at *11 (E.D.N.Y. Feb. 14, 2017), report and recommendation adopted, 2017 WL 835174 (E.D.N.Y. Mar. 2, 2017).

Given the clarity of the case law on this issue, the Court holds that, having determined that plaintiff was paid less than minimum wage only for her last two weeks of employment, for the weeks starting 1/1/2024 and 1/8/2024, plaintiff is entitled to spread-of-hours pay under the NYLL only for those last two weeks.[22]  For those last two weeks, the jury found she worked a

---

[22] Because on the supplemental verdict sheet these two weekly periods were full 7-day weeks, the Court need not prorate the number of spread-of-hours days, as it prorated the hours worked per week for overtime damages.

spread of 10 or more hours and was not paid spread-of-hours compensation for 5 days each week, and the relevant minimum wage was $16 per hour.  Plaintiff's resulting spread-of-hours damages is $160.

### D. Weekly Periods in the Supplemental Verdict Sheet

The Court notes that some weekly periods on the supplemental verdict sheet were shorter than 7 days.  Both parties' proposed supplemental verdict sheets listed these exact weekly periods, and the Court adopted them for the final version given to the jury.  Not only did the parties submit charts proposing these shorter weeks, but their lengths were intentionally shorter to account for the fact that the NYLL minimum wage rate did not always change conveniently at the beginning of a weekly period.[23]  Had every weekly period been exactly 7 days, some rows in the supplemental verdict sheet chart would have spanned two different minimum wage rates, making it challenging to calculate damages at the proper rate.  For example, the minimum wage rate changed on 12/31/2019, a Tuesday, but the full calendar week started on 12/30/2029, a Monday; accordingly for this rate change, the chart included the following weekly periods: 12/23/2019-12/29/2019 (the normal 7-day preceding week at the previous minimum wage rate), 12/30/2019-12/30/2019 (the one day of the calendar week in question at the previous minimum wage rate), 12/31/2019-1/5/2020 (the shortened week Tuesday-Sunday at the new minimum wage rate).  In total, the supplemental verdict sheet included 11 weekly periods shorter than 7 days, which are equivalent to 6 calendar weeks, a small fraction of the 311 calendar weeks between 1/30/2018 and 1/15/2024.

During the charge conference, the parties' counsel noted that some weekly periods were shorter than 7 days and explained the reason behind that choice.  All parties agreed that the

---

[23] In the charge conference held on December 16, 2025 evening, plaintiff requested that the Court calculate weeks starting on Mondays and concluding on Sundays.

weekly periods made sense and should remain as-is in the supplemental verdict sheet. Given that both parties proposed the same supplemental verdict sheet incorporating these exact weeks, and given that the issue was discussed with the parties and no objection was raised at that time, the Court adopted the parties' agreed-upon chart.

Nevertheless, the jury appears to have filled out the chart based on a 7-day week for the entire period from January 2018 through January 2024. Continuing the above example, for the weekly period that spanned one day, from 12/30/2019-12/30/2019, the jury found that plaintiff worked 45 hours and that there were "5 days (M-F)" where she worked a spread of 10 or more hours. These determinations, obviously, are mathematically impossible. In her motion for a new trial, plaintiff refers to these shorter weeks and the jury's "inconsistent" verdict sheet as "fundamental errors" warranting a new trial. (Pl.'s Mot. at 13-17). However, the Court assumes the jury would not have intentionally made mathematically impossible determinations. In light of the fact that both parties proposed the same supplemental verdict sheet incorporating these exact weeks, and given that the length of weeks was addressed prior to presenting the chart to the jury, the Court prorates the number of hours plaintiff worked for each weekly period to account for those weeks that are shorter than 7 days. The exact calculations are discussed below.

E.  Prorated Number of Hours Worked per Week

To account for the fact that some weekly periods on the supplemental verdict sheet were shorter than 7 days, the Court calculated the overtime owed to plaintiff during these weeks by prorating the number of hours worked. Specifically, the Court divided the number of hours the jury found plaintiff worked in a weekly period by seven days, and multiplied that number by the actual number of days in that weekly period.[24] For example, for the weekly period starting

---

[24] As discussed above, the Court found that plaintiff was only entitled to spread-of-hours pay for the last two weeks of her employment. However, in determining whether plaintiff was paid less than the minimum wage

Tuesday 1/30/2018 and ending Sunday 2/4/2018, the jury found plaintiff worked 50 hours, but there were only 6 days in this period. Dividing 50 hours by 7 days, and multiplying that by 6 results in a prorated number of hours of 42.86 for this weekly period.

In calculating the amount of overtime pay owed for these prorated weekly periods, the Court applied the higher minimum wage applicable at the time. These prorated amounts were added to overtime calculated for the remainder of the time, resulting in a total amount of overtime of $4,975.75.[25]

In total, plaintiff's minimum wage, overtime, and spread-of-hours damages under the NYLL amount to $5,168.75.

<u>MOTION FOR A NEW TRIAL</u>

On December 23, 2025, plaintiff moved for a new trial, raising a number of arguments. (Pl.'s Mot.). Plaintiff first argued that the verdict was against the weight of the evidence, and challenged the jury's findings that defendants acted in "good faith" and that defendant Keeper Holdings, Inc. was not plaintiff's employer. Plaintiff also challenged the number of hours the jury found plaintiff actually worked, arguing that it was against the weight of the evidence. Plaintiff also seeks a new trial arguing that the verdict sheet contained "numerous fundamental errors and inconsistencies." (Pl.'s Mot. at 6-7).

In a subsequent filing dated December 29, 2025, plaintiff moves for a new trial on the additional ground that "the Court committed a material procedural error by withdrawing critical factual issues from the jury after previously ruling that those issues would be decided by the

---

and would therefore be entitled to spread-of-hours pay, the Court prorated the number of days in the weeks when the pay rate changed by considering that the jury specified that the 5 days each weekly period that they found plaintiff worked a spread of 10 or more hours was "M-F," meaning each weekday but not on weekend days. Thus, for each weekly period shorter than 7 days, the Court counted the number of weekdays and used that as the prorated number of spread-of-hours days for that period. As noted, plaintiff was paid at least the minimum wage rate under NYLL for these periods, the only exception being the final two weeks, for which the Court awards her spread-of-hours pay.

[25] For a detailed chart of damages calculations, please see Appendix 1 below.

jury." (Pl.'s Supp. Mot. at 1). Those factual issues were "whether plaintiff was expected to work more than 40 hours per week and whether defendants have proved by a preponderance of the evidence that the $750 per week was intended by both parties to cover all hours worked or only 40 hours per week." (ECF No. 48).

I.    Legal Standard

Under Rule 59(a) of the Federal Rules of Civil Procedure, "[t]he court may, on motion, grant a new trial on all or some of the issues – and to any party . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court," including if the verdict is against the weight of the evidence. Fed. R. Civ. P. 59(a)(1)(A). Unlike a motion for judgment as a matter of law, the trial court may grant a new trial even where the jury's verdict is supported by substantial evidence. Song v. Ives Labs., Inc., 957 F.2d 1041, 1047 (2d Cir. 1992); Bevevino v. Saydjari, 574 F.2d 676, 683-84 (2d Cir. 1978). Additionally, a trial judge is free to weigh the evidence, and is not required to view the evidence in the light most favorable to the verdict winner. See DLC Mgmt. Corp. v. Town of Hyde Park, 163 F.3d 124, 134 (2d Cir. 1998); Bevevino v. Saydjari, 574 F.2d at 684.

A trial judge may grant a new trial motion if he or she determines that "the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice, i.e., that the verdict is against the weight of the evidence, that the damages awarded were excessive, or that for stated reasons the trial was not fair to the moving party." Mallis v. Bankers Trust Co., 717 F.2d 683, 691 (2d Cir. 1983) (internal quotations and citations omitted). The Second Circuit has held that "[t]he trial judge, exercising a mature judicial discretion, should view the verdict in the overall setting of the trial; consider the character of the evidence and the complexity or simplicity of the legal principles which the jury was bound to apply to the facts; and abstain from interfering with the verdict unless it is quite clear that the jury has reached a seriously erroneous

result." <u>Bevevino v. Saydjari</u>, 574 F.2d at 684 (citation omitted); <u>Mazza v. Dist. Council for New York & Vicinity United Bhd. of Carpenters & Joiners of Am.</u>, No. 00 CV 6854, 2010 WL 11603030, at *14 (E.D.N.Y. May 12, 2010).  The trial court must accord "the jury's evaluation of witness credibility" a "high degree of deference," and, accordingly, "jury verdicts should be disturbed with great infrequency," <u>Raedle v. Credit Agricole Indosuez</u>, 670 F.3d 411, 418 (2d Cir. 2012), even where the trial court may have disagreed with the jury, <u>Bevevino v. Saydjari</u>, 574 F.2d at 685.

II.   <u>Defendant Keeper Holdings, Inc.'s Employer Status</u>

Plaintiff argues that the jury's finding that defendant Keeper Holdings, Inc. was not plaintiff's employer "severely contradicts the weight of the evidence."  (Pl.'s Mot. at 11-12).

The parties dispute whether defendant Keeper Holdings was plaintiff's employer during the time period she claims she worked for defendants.  In the charge to the jury, the Court advised that:  "For plaintiff to succeed on her claim against Keeper Holdings Incorporated, she must prove by a preponderance of the evidence that she was an employee of the corporate defendant, Keeper Holdings."  (Tr.3 at 599).  "To establish that defendant Keeper Holdings was plaintiff's employer, plaintiff must show that Keeper Holdings: 1) had the power to hire and fire plaintiff; 2) supervised and controlled plaintiff's work schedules or conditions of employment; 3) determined the rate and method of payment; and 4) maintained employment records."  (<u>Id.</u>)  "No one factor controls the outcome."  (<u>Id.</u> at 600).  Instead, the jury was instructed to "look at the totality of the circumstances to determine whether plaintiff has proven by a preponderance of the evidence that Keeper Holdings was plaintiff's employer."  (<u>Id.</u>)  The jury was also advised that, should they find Keeper Holdings was plaintiff's employer, they would also need to determine on what date plaintiff began working for Keeper Holdings.  (<u>Id.</u>)

Here, the evidence clearly showed that when initially hired, plaintiff was hired by the individual defendants to care for their children and to do light housework. Over time, the testimony indicated that defendant Lee would periodically ask plaintiff to engage in activities related to defendant's work as owner and designer for the corporation. Plaintiff testified that she was asked to unpack and pack boxes of clothing received at the house, to photograph defendant Lee in certain clothing, to iron clothing at times, and to mail through FedEx or UPS boxes of items to be shipped to China and elsewhere. Plaintiff further testified that four times a year, beginning in the later part of her employment, defendant Lee would ask plaintiff to assist in preparing for the semi-annual photo shoots of defendant's designs. This included wrapping the bottoms of shoes worn by the models, and packing and transporting props and accessories, along with defendant Lee, to the photo shoots in Manhattan, along with other tasks.

Defendant Lee, in her testimony, conceded that at times she would ask for plaintiff's help, especially after COVID when defendant Lee worked consistently out of the home. She conceded that she asked plaintiff to help her with items she received at the home, but she denied that plaintiff was responsible for shipping items to customers; that was done by the company's independent warehouse. Moreover, defendant Lee made it clear that she received a lot of items by mail but not all of them were related to the business; they were for her personally. She conceded that plaintiff did assist at times in preparing for the photo shoots, especially when she had props that needed to be transported, but she testified that plaintiff was asked to do this instead of her childcare responsibilities and that, at most, plaintiff would be involved only in the first and last day of the photo shoots.

Neither side presented any testimony or documentary evidence showing that anyone at Keeper Holdings, other than defendant Lee, had the power to hire and fire plaintiff, or exercised

any supervisory control over plaintiff's work schedules or conditions of employment working for the business. Nor was there any evidence that plaintiff expected or was told she would receive pay for the work she was doing related to company. Indeed, defendants denied that plaintiff was ever employed by Keeper Holdings, which had its own staff and an independent warehouse responsible for shipping the items sold by the company.[26]

Based on the totality of the evidence, the Court finds that the jury's verdict with regard to whether plaintiff was an employee of Keeper Holdings was not against the weight of the evidence. Given the sporadic and limited nature of the work plaintiff testified she was asked to do, and the limited time it took for her to do these tasks, the jury could have concluded that these were additional tasks that plaintiff was asked to undertake as part of her household responsibilities. The jury could have found, based on the evidence, that defendant Lee asked plaintiff to assist her with the boxes and items shipped to the home in order to maintain order in defendant's workspace.[27] This did not amount to a basis for finding that plaintiff was an employee of Keeper Holdings, and indeed, that would be consistent with the jury's finding as to the number of hours worked by plaintiff in total.

Thus, the Court finds that the jury's determination as to whether Keeper Holdings was plaintiff's employer was not against the weight of the evidence, nor was it a miscarriage of justice.

---

[26] According to Ms. Lee, Keeper Holdings, which at the time of trial has been in business over 17 years, sold items to over 200 boutique retail stores, in addition to others, during the relevant period. (Tr.3 at 498). It is inconceivable that plaintiff was responsible for handling that volume of shipping from the home. The evidence was such that the jury could have reasonably believed that much of the packing and shipping was, as testified to by Ms. Lee, samples that Ms. Lee used in her role as designer for the company that she had shipped to the home where she was working at the time.

[27] Based on the undisputed evidence that plaintiff's childcare responsibilities decreased as the children got older and the family's work location changed, the jury could reasonably have found that plaintiff's overall responsibilities and tasks had decreased. Indeed, defendant Yang testified that there came a point in time, after the children were attending school full time and both defendants were working from home, that the defendants considered whether they still needed plaintiff, given the reduction in childcare responsibilities.

III.    Whether the Jury's Findings Regarding Plaintiff's Uncompensated Hours Are Against the Weight of the Evidence

Plaintiff asserts that a new trial is warranted because the jury's verdict as to the number of hours worked was against the weight of the evidence.

As an initial matter, plaintiff argues that the Court erred in failing to ask the jury to determine "whether plaintiff was expected to work more than 40 hours per week and whether defendants have proved by a preponderance of the evidence that the $750 per week was intended by both parties to cover all hours worked or only 40 hours per week." (ECF No. 48).  As discussed *supra* at note 17, all of the witnesses, including plaintiff, testified that there was no agreement between the parties as to how many hours the plaintiff's salary was intended to cover. (See discussion *supra* at 7, 13).  Instead, the evidence clearly demonstrated that plaintiff was expected to perform childcare services according to the children's schedule, but the remainder of plaintiff's job responsibilities was task-based, and there was no understanding that there were particular hours during which plaintiff was responsible for completing those tasks.  (Id.) Although plaintiff now argues that the jury should have been asked how many hours the salary was intended to cover (Pl.'s Supp. Mot. at 2), plaintiff has not cited any evidence or provided any basis upon which a reasonable jury could have considered the question, without engaging in pure speculation. Thus, given the absence of any evidence upon which a reasonable jury could make such a determination, the Court determined that it would be improper to put this question to the jury.

Furthermore, the Court has determined that the "regular rate" is calculated according to the statutory method of dividing the weekly salary by the number of hours actually worked, and that there is no presumption that a weekly salary is intended to cover only the first 40 hours worked in a week.  (See discussion *supra* at 27-33).  Therefore, even if there had been evidence

44

upon which a jury could determine how many hours plaintiff's salary was intended to cover, which the Court has found there was not, the Court determines that such evidence would not have been relevant for calculating the regular rate for purposes of assessing damages.

With regard to plaintiff's argument that the jury's analysis of the number of hours worked was against the weight of the evidence, the Court finds otherwise. The evidence was clear that when plaintiff was initially hired in 2015, her main responsibility was to care for the defendants' two young daughters, and to perform light housework. (Tr.1 at 126, 129; see also Tr.2 at 204, 244-45 (agreeing that her priority was childcare and, on cross-examination, recalling testimony during her deposition that the job was described as covering the time when the children woke up in the morning until dinner)). She testified that when she was hired, no one told her how many hours she was expected to work, nor was she told that her weekly pay was limited to a certain number of hours. (Tr.2 at 244, 248). This was corroborated by defendant Yang's testimony that plaintiff's salary was based on her responsibilities, which she did at her discretion, with no expectation that she would work a fixed number of hours. (Tr.3 at 395, 447-48). He explained that her salary did not change from week to week based on the hours worked. (Id. at 395, 448).

The evidence showed that her responsibilities changed over time as the children grew older and the family moved to a new home and dealt with COVID. In 2018, the beginning of the statutory period for potential recovery, plaintiff testified that she was uncertain as to whether and when the younger child was in school. (Tr.2 at 254). During cross examination, plaintiff agreed that in 2018, both children would leave for school at 7:50 a.m., with the younger daughter finishing school at 1:00 p.m. (Id. at 255-56). This was consistent with defendant Yang's testimony that in the beginning of 2018, his older daughter attended Our Lady of Grace Catholic School, and the younger daughter was also attending school at the same place. (Tr.3 at 397-98).

Both children began school at 8:30 a.m., with the older daughter's day ending at 3:00 p.m.; the younger daughter, who was only three at the time, ended school at 1:00 p.m. (Id. at 398). According to defendant Yang, when the younger daughter turned four in 2018, she began staying in school until 3:00 p.m. (Id.) Thereafter, from September 2019 until the end of plaintiff's employment, the children's school schedules remained consistently from 8:30 a.m. to 3:00 p.m. (Id. at 400). Based on these schedules, plaintiff was responsible for caring for the younger child during the first period from 1:00 p.m., when she returned home from school, and then caring for both children after 3:00 p.m., when the older child returned home from school, until defendant Yang returned from work at 7:00 or 7:30. In total, based on the evidence, the jury could reasonably have found that during this earlier period, plaintiff's childcare responsibilities were only 6 to 6 ½ hours per day, not including the time it took to prepare breakfast. During the latter period, her childcare responsibilities were reduced to 4 to 4 ½ hours per day when both children were in school. Indeed, plaintiff conceded that during the time the children were in school, she had no childcare responsibilities. (Tr.2 at 256).

Although the parties were in agreement that plaintiff performed a variety of household tasks throughout her employment, the testimony was unclear as to how much time that required on a weekly basis. Plaintiff testified that in addition to her childcare responsibilities, she was also expected to perform light household tasks, including meal preparation for the entire family, dishwashing, laundry for the entire family, grocery shopping, vacuuming the house, and cleaning the two bathrooms. (Tr.1 at 126, 129; Tr.2 at 204, 279-86). During this period in 2018, plaintiff testified that she was responsible for preparing breakfast for the children and for defendant Yang; defendant Lee did not usually eat breakfast. (Tr.1 at 130). Defendant Yang corroborated this testimony, stating that plaintiff was responsible for preparing a light breakfast, but this was her

46

only early morning duty. (Tr.3 at 404). While the children were in school, plaintiff testified that she performed the various household chores that she was responsible for. (Tr.2 at 266-67).

Defendant Yang corroborated plaintiff's testimony, averring that she was not given a list of specific tasks, nor was she required to finish any tasks by a particular time. (Id. at 405). "She had full discretion to do what she wanted during the school day and she only had to be there to pick [the children] up." (Id.) During the time the children were in school, she could have performed housecleaning tasks or taken a nap; there was "no expectation." (Id.) Also, during after school hours, the children watched cartoons, and plaintiff was free to do other things, including preparation of the family meal. (Id. at 409).

With respect to the housework she was required to do, plaintiff testified that initially she did the laundry three or four times a week until defendant Lee told her she was doing it too often. (Tr.1 at 137). On cross examination, plaintiff conceded that she did not do the laundry every day, and she estimated that it took her approximately 40 minutes to do the laundry, explaining that she would do other things during this time. (Tr.2 at 279-81). She further estimated that on average it took her 30 minutes to clean the family's two bathrooms, which she did not do every day but only whenever they were dirty. (Id. at 280). She was unable to estimate exactly how much time she spent vacuuming, although she testified at one point that it took her an hour. (Id. at 281). She went grocery shopping four times a week, sometimes while the children were in school, and sometimes she would take the children with her. (Id. at 289). After the children returned home from school, she would prepare dinner, and feed the children. (Tr.1 at 134). Although defendant Yang testified that he only saw her cleaning the bathrooms every two weeks, doing the laundry no more than twice a week, changing the bedding once a month, and doing grocery shopping once a week (Tr.3 at 411), the jury could have completely discounted his

testimony and yet reached a determination of her overtime hours based solely on plaintiff's own estimates. Indeed, based on plaintiff's own testimony as to the amount of time she believed it took her to perform the tasks she was expected to perform, the jury's finding that she did not work a significant amount of overtime is consistent with a finding that her expected household chores could easily have been performed during the time the children were in school and after they returned home from school.[28]

On Saturdays, there was no set schedule. Plaintiff testified that during this time in 2018, on Saturdays, she would prepare breakfast for the family and then the children would often go somewhere to play or to visit their grandma. (Tr.1 at 139; Tr.2 at 207). Defendant Yang corroborated this testimony, indicating that Saturdays were family time so they would visit relatives or go on outings with the children, "[s]o she would have the opportunity to do housekeeping at that time," usually until noon, after which "she would . . . do whatever she wanted." (Id. at 412). She was not mandated to do work on Saturdays, except making breakfast and lunch. (Id. at 413). On "Sundays she was gone." (Id.) Plaintiff claimed, however, that even though the family might be gone, she still had to give the house a thorough cleaning and prepare food for dinner if they came home. (Tr.1 at 139-40). She testified that it was understood that Sundays were her days off and she would often go to a friend's house Saturday night and spend Sunday working at her church. (Id. at 140-41; Tr.2 at 207).

When COVID struck in 2020, the testimony indicated that the children attended school remotely, working in the space on the top floor of defendant Yang's mother's home. (Tr.3 at 422, 512). The testimony demonstrated that during this period, plaintiff's childcare

---

[28] Arguably, the jury could have found that plaintiff's household tasks were reduced when the family moved to Mr. Yang's mother's home because defendant's mother occupied the entire first floor of the house, which plaintiff was not responsible for cleaning unless the children made a mess. (Tr.2 at 276).

responsibilities were significantly reduced because the parents were at home full time and defendant Yang's mother often watched the children. Based on his observations, defendant Yang testified that plaintiff would "watch a lot of TV . . . like that throughout the day," and go on walks. (Id. at 424-25). Defendant Yang testified that plaintiff would take walks, play the violin, go golfing, and was very active in church. (Id. at 429). Since both he and his wife were working from home, plaintiff could not vacuum, but she still prepared meals for the family. (Id.) Thus, the jury's verdict that plaintiff worked no overtime during this period is consistent with both plaintiff's and defendants' testimony.

Similarly, the jury's verdict regarding plaintiff's childcare responsibilities after COVID is reasonable based on the fact that the children continued to follow the same school schedule once things returned to normal, and there was no indication that the hours from 3:00 to 7:00 p.m. changed significantly during this time. Defendant Yang testified that during the summer of 2018, both daughters went to summer camp Monday through Friday from 9:00 a.m. to 3:00 p.m., beginning in July. (Id. at 400-01). Thus, plaintiff was only responsible for the children from 3:00 until 7:00 p.m. – "four hours" a day, Monday through Friday. (Id. 408). This continued until the start of the COVID lockdowns. (Id. at 408-09).

Although plaintiff testified that she was required to undertake additional responsibilities while the family undertook renovations prior to selling the Hemlock house (Tr.2 at 207-08), the defendants' testimony contradicted plaintiff's recollection of what she was asked to do and how much time it took. (Tr.3 at 415-17, 508-09).[29] Defendants Yang and Lee denied ever asking plaintiff to assist with the renovations, but both conceded that she may have cleaned up dust or helped with the packing. (Id. at 416-17, 508-09). Defendant Yang also contradicted plaintiff's

---

[29] This testimony was contradicted by defendants. (See discussion *supra* at 16).

testimony as to when the family moved out of the Hemlock home.  Contrary to plaintiff's

testimony that the family moved out in April, defendant stated that the family stayed in the home

during the renovations because the older daughter was taking the bus to school until June and

after that, they stayed so the children could use the pool.  (Id. at 415-16).

As for the journal entries which began on July 25, 2022, in which plaintiff listed a variety

of tasks she performed on a daily basis, both defendants Yang and Lee testified that the hours

plaintiff claimed to have worked were not consistent with what they observed.  Defendant Yang

stated that she did not appear to be working very long hours; "[s]he had a very comfortable

schedule."  (Id. at 444).

Similarly, to the extent that plaintiff testified that she did a lot of work for defendant

Lee's business (e.g., Tr.1 at 163-68; see discussion supra at 41-43), this testimony was also

disputed by defendants, and the jury could have concluded that it did not result in a significant

increase in plaintiff's hours such that it required additional overtime to complete.

After hearing the testimony and analyzing the jury's verdict, the Court finds that not only

is the jury's verdict supported by substantial evidence, Song v. Ives Labs., Inc., 957 F.2d 1041,

1047 (2d Cir. 1992), but even viewing the evidence in the light most favorable to the plaintiff,

which the Court is not required to do, plaintiff's own testimony failed to demonstrate that she

worked significantly more overtime than found by the jury.  Her own testimony demonstrated

the limited number of hours in the day consumed by her childcare responsibilities, especially

during the latter part of her employment when the children were older, but her own estimates of

the amount of time it took her to complete the household tasks demonstrated that they could be

easily completed during the time she was caring for the children or consumed only a few hours

of time while they were in school.   To the extent that plaintiff's counsel urged the jury in

summation to find that plaintiff worked 83 hours per week over the entire period, the jury could have completely discounted this, finding that it was an extreme exaggeration which contradicted the evidence.

Accordingly, the Court finds no reason to disagree with the jury's verdict or to find that there has been a miscarriage of justice and that a new trial is warranted. Thus, the Court denies the plaintiff's motion for a new trial.

IV.    Alleged "Inconsistencies" in the Supplemental Verdict Sheet

In her motion, plaintiff argues that the fact that certain weeks were shorter than 7 days in the supplemental verdict sheet but the jury filled out the chart as though each week were uniformly 7 days long means that the supplemental verdict sheet contained "fundamental errors" and "inconsistencies," warranting a new trial. (Pl.'s Mot. at 13-17). As discussed above in the damages calculation section, the Court disagrees with plaintiff's assessment and holds that any potential inconsistencies may be eliminated through prorating the number of hours plaintiff worked per week by the actual number of days in each weekly period shorter than 7 days, and then calculating any amounts owed using the higher minimum wage rate applicable during that period.

V.    Liquidated Damages & Good Faith

Plaintiff next argues that the Court erred in its charge to the jury on whether defendants' violation was willful. Given the jury's finding that the defendants acted in good faith, the plaintiff is not entitled to an award of liquidated damages.

A.    Legal Standard

Where the jury finds that defendants violated the New York Labor Law, plaintiff may also receive liquidated damages in the amount of 100% of her damages if the jury also

determines that the violation was willful.[30]  In this case, the jury was instructed that it is "the defendants' burden to prove by a preponderance of the evidence that they acted in good faith." (Tr.3 at 608); see N.Y. Lab. Law § 198(1-a); Inclan v. New York Hosp. Grp., Inc., 95 F. Supp. 3d 490, 505 (S.D.N.Y. 2016).  "To meet the good faith standard, defendants must prove by a preponderance of the evidence that they had a good faith basis to believe that their underpayment of wages was in compliance with the law."  (Tr.3 at 608); see Canelas v. World Pizza, Inc., 2017 WL 1233998, at *13-14 (S.D.N.Y. Mar. 31, 2017).  "This means that defendants must prove by a preponderance of the evidence that they had an honest intention to ascertain what the law requires and took objectively reasonable steps to comply with the law."  (Tr.3 at 608); see Herman v. RSR Sec. Servs. Ltd., 172 F.3d 132, 142 (2d Cir. 1999) (holding that "[t]o establish good faith, the employer must take active steps to ascertain the dictates of the FLSA and then act to comply with them" (citation omitted)); Reich v. Southern England Telecommunications Corp., 121 F.3d 58, 71 (2d Cir. 1997) (holding that "[t]o establish good faith, a defendant must produce plain and substantial evidence of at least an honest intention to ascertain what the Act requires and to comply with it" (citation and quotations omitted)); see also Leevson v. Aqualife USA Inc., 770 Fed. App'x 577, 583 (2d Cir. 2019) (holding that defendant had not come close to demonstrating good faith because "[i]t presented no evidence that it took active steps to ascertain the dictates of the FLSA [and NYLL] and then act[ed] to comply with them, as required to demonstrate subjective good faith" (citations and quotations omitted)).  "Being ignorant of the law or uncertain about its requirements is not enough to meet the good faith standard."  (Tr.3 at

---

[30] Although the statutory text of the liquidated damages provisions differs between the FLSA and NYLL, "courts have not substantively distinguished the federal standard from the current state standard of good faith."  Inclan v. New York Hosp. Grp., Inc., 95 F. Supp. 3d at 505; Cabrera v. Dream Team Tavern Corp., 2016 WL 6208245, at *1 (E.D.N.Y. Apr. 29, 2016) (stating the FLSA standard employs a subjective 'good faith' and objective 'reasonable grounds' standard, and that the NYLL 'willfulness' standard mirrors the FLSA 'good faith' standard).

608).  If defendants fail to meet their burden, the jury's verdict on the issue of willfulness must be for the plaintiff.  (Id.)

At the first charge conference, plaintiff asked to include in the charge a further explanation about what constitutes good faith.[31]  The Court did so as proposed by plaintiff, with the final language included above:  "defendants must prove by a preponderance of the evidence that they had an honest intention to ascertain what the law requires and took objectively reasonable steps to comply with the law."  Plaintiff accepted the change without objection and did not raise an objection at the conclusion of the charge.

### B.  The Jury's Response to the Good Faith Question

The supplemental verdict sheet asked the jury to answer the following question:  "To the extent that the defendants failed to compensate plaintiff the applicable overtime wages, did defendants prove, by a preponderance of the evidence, that they had a good faith basis to believe that their underpayment of wages was in compliance with the law?"  The jury checked "YES" in response to this question.  Although plaintiff argues that the jury misunderstood the question or disregarded the charge on good faith, the Court notes that the jury did not raise any questions about this particular charge, nor did they ask to have the charge on good faith read back to them.  By comparison, the jury asked the Court to read back the charge regarding whether the corporate defendant was plaintiff's employer, indicating that the jury knew they could ask for clarification but did not believe they needed clarification for the good faith question.

Considering the jury's determination that the plaintiff worked either 44 hours per week with no overtime, or 45 hours per week with one hour of overtime for approximately 54% of the

---

[31] Indeed, plaintiff's attorney suggested adding a definition of "good faith" for purposes of finding liquidated damages under the NYLL, and the Court added such a definition to the charge based on this suggestion. Counsel also proposed edits to the special verdict form which was given to the jury to assist them in their determination.

weeks worked, it appears that the jury determined that plaintiff did not work very many hours of overtime, if any.  Thus, the jury's finding that defendants acted in good faith is consistent with a finding that even if defendants did not keep track of plaintiff's exact hours, the defendants may have believed either that plaintiff was not working overtime at all or that they were paying plaintiff enough for any small amount of overtime that she might be working.  Although plaintiff argues that the defendants' failure to keep track of the hours worked by plaintiff and to maintain proper records is sufficient to warrant an award of liquidated damages, it is a question for the jury to evaluate the credibility of the witnesses and determine from the circumstances if the defendants were acting in good faith.

Given the jury's verdict with regard to the number of hours of overtime worked by plaintiff, and respecting the jury's determination of the credibility of the witnesses, the Court finds no basis to disregard the jury's verdict on the issue of defendants' good faith.  In the absence of any serious error or a miscarriage of justice – which the Court does not find in this instance – the Court denies plaintiff's request for a new trial based on the jury's determination of good faith.

<u>CONCLUSION</u>

Accordingly, for the reasons set forth above, the Court denies plaintiff's post-verdict motion for a new trial because plaintiff had a full and fair opportunity to litigate her claims, and the jury appropriately evaluated the evidence, giving due regard to the credibility of witnesses and documents, and arrived at a reasonable resolution of the case.  The Court awards $5,168.75 in damages, taking into consideration the jury's verdict.

The Clerk is directed to send copies of this Order to the parties either electronically through the Electronic Case Filing (ECF) system or by mail.

**SO ORDERED.**

Dated: Brooklyn, New York
      January 8, 2026

/s/ Cheryl L. Pollak
Cheryl L. Pollak
United States Magistrate Judge
Eastern District of New York

APPENDIX 1: DAMAGES CHART

| Summary Damages Chart – Overtime | | | | | | | |
|---|---|---|---|---|---|---|---|
| Overtime Period[32] | Hours Worked Per Week | Over-time Hours Per Week [33] | No. of Weeks | NYLL Mini-mum Wage | Plaintiff's Regular Rate[34] | Overtime Rate | Overtime Damages Owed[35] |
| 1/30/2018 (6 days) | 42.857[36] | 0 | 1 | $11 | $15 | $22.50 | $0 |
| 2/5/2018 to 12/24/2018 | 50 | 6 | 47 | $11 | $15 | $22.50 | $2,115[37] |
| 12/31/2018 to 6/24/2019 | 45 | 1 | 26 | $12 | $16.667 | $25 | $216.667[38] |
| 7/1/2019 to 8/26/2019 | 44 | 0 | 9 | $12 | $17.045 | $25.568 | $0 |
| 9/2/2019 to 12/23/2019 | 45 | 1 | 17 | $12 | $16.667 | $25 | $141.667[39] |
| 12/30/2019 to 3/9/2020 | 45 | 1 | 11[40] | $13 | $16.667 | $25 | $91.667[41] |
| 3/16/2020 to 12/21/2020 | 44 | 0 | 41 | $13 | $17.045 | $25.568 | $0 |
| 12/28/2020 to 12/20/2021 | 44 | 0 | 52 | $14 | $17.045 | $25.568 | $0 |

[32] Dates refer to the beginning of each weekly period.

[33] Residential workers are entitled to overtime compensation at a rate of 1.5 times the regular rate, for all hours worked in excess of 44 in a week. 12 N.Y.C.R.R. § 142-2.2.

[34] As discussed in this Memorandum and Order, the regular rate of pay for plaintiff, a non-hospitality worker, is calculated pursuant to the statutory method of dividing plaintiff's weekly salary of $750 by the total number of hours that the jury found she worked in a week. 12 N.Y.C.R.R. § 142-2.16.

[35] Overtime damages for each week are calculated by subtracting the regular rate from the overtime rate, multiplied by the number of overtime hours worked in that week. E.g., Rafter v. Everlast Sign & Serv. Inc., No. 21 CV 4588, 2025 WL 2240446, at *33 (E.D.N.Y. Aug. 6, 2025).

[36] This is the prorated number of hours per week, given that the weekly period 1/30/2018 through 2/4/2018 is only 6 days long.

[37] ((($750 / 50) * 1.5) – ($750 / 50)) * 6 hours per week * 47 weeks = $2,115

[38] ((($750 / 45) * 1.5) – ($750 / 45)) * 1 hour per week * 26 weeks = $216.667

[39] ((($750 / 45) * 1.5) – ($750 / 45)) * 1 hour per week * 17 weeks = $141.667

[40] For those weekly periods on the supplemental verdict sheet that were shorter than 7 days, the Court added together the two shorter weekly periods, counting them as one full week for this column. For example, the supplemental verdict sheet had a weekly period from 12/30/2019 through 12/30/2019 (1 day long), and a weekly period from 12/31/2019 through 1/5/2020 (6 days long); together, they made a full week starting Monday and ending Sunday. Accordingly, the Court counted those two weekly periods as one full week for this column.

[41] ((($750 / 45) * 1.5) – ($750 / 45)) * 1 hour per week * 11 weeks = $91.667

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 12/27/2021 to 7/18/2022 | 44 | 0 | 30 | $15 | $17.045 | $25.568 | $0 |
| 7/25/2022 to 12/25/2023 | 48 | 4 | 75 | $15 | $15.625 | $23.438 | $2,343.75[42] |
| 1/1/2024 to 1/8/2024 | 48 | 4 | 2 | $16 | $15.625 | $24[43] | $67[44] |
| | | | | | | **Total Overtime Damages:** | **$4,975.75** |

**Minimum Wage Damages: $33**

**Spread-of-Hours Damages: $160**

**Total Damages Owed: $5,168.75**

---

[42] $((\$750 / 48) * 1.5) – (\$750 / 48)) * 4$ hours per week * 75 weeks = $2,343.75

[43] Where the regular rate is less than the minimum wage, the overtime rate is calculated by multiplying the minimum wage by 1.5.

[44] $(\$24 – (\$750 / 48)) * 4$ hours per week * 2 weeks = $67